## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| MULTIMEDIA CONTENT MANAGEMENT LLC,<br><br>        Plaintiff<br><br>v.<br><br>DISH NETWORK CORPORATION,<br><br>        Defendant. | Civil Action No.: 6:18-cv-207<br><br>JURY TRIAL DEMANDED<br><br>PATENT CASE |

## PLAINTIFF'S ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Multimedia Content Management LLC ("MCM" or "Plaintiff"), files this Complaint against DISH Network Corporation seeking damages and other relief for patent infringement, and alleges with knowledge to its own acts, and on information and belief as to other matters, as follows:

## PARTIES

1. Plaintiff is a limited liability company organized and existing under the laws of the State of Texas, having its principal place of business at 5068 West Plano Parkway, Suite 300, Plano, Texas 75093.

2. Defendant DISH Network Corporation ("DISH" or "Defendant") is a Nevada corporation with regular and established physical places of business within this judicial district, and its principal place of business at 9601 South Meridian Boulevard, Englewood, Colorado. DISH is registered for the right to transact business in Texas and has a Texas taxpayer number (18803369976).

## JURISDICTION AND VENUE

3.      This action arises under the patent laws of the United States, 35 U.S.C. §101, *et seq*.  This Court has subject matter jurisdiction under 28 U.S.C. §§1331 and 1338(a).

4.      Venue is proper in this judicial district under 28 U.S.C. §1400(b).  DISH maintains regular and established physical places of business within this judicial district, including but not limited to: (i) a Customer call center, warehouse, service, and remanufacturing center located at 1285 Joe Battle Blvd., Suite A, El Paso, Texas; (ii) a micro digital broadcast operations center near Mustang Ridge, Texas; and (iii) a regional digital broadcast operations center near New Braunfels, Texas.  (DISH Annual Report for year ending 12/31/2017 at p. 58, available at http://www.annualreports.com/Company/dish-network-corp).   On information and belief, from and within this District, DISH has committed acts of infringement at issue in this case.

5.      Defendant is subject to this Court's specific and general personal jurisdiction pursuant to due process or the Texas Long Arm Statute, due at least to Defendant's substantial business in this forum, including: (i) business related to infringing acts as alleged herein; or (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct, or deriving substantial revenue from goods and services provided to individuals in Texas and in this district.  Within this state, Defendant has committed, and continues to commit, acts of patent infringement as alleged herein.  In addition, Defendant has derived revenues from

its infringing acts occurring within the Western District of Texas.   Further, Defendant is subject to the Court's general jurisdiction, including from regularly doing or soliciting business, engaging in other persistent courses of conduct, and deriving substantial revenue from goods and services provided to persons or entities within Texas and within the Western District of Texas.   Further, Defendant is subject to the Court's personal jurisdiction at least due to its sale of products or services within Texas and within the Western District of Texas.   Defendant has committed such purposeful acts or transactions in Texas such that it reasonably should know and expect that it could be haled into this Court because of such activity.

## THE PATENTS IN SUIT

6.     The United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 8,799,468 ("the '468 Patent") entitled "System for Regulating Access to and Distributing Content in a Network" to Robert M. Burke II and David Z. Carman on August 5, 2014.   The '468 Patent claims priority from United States Patent Application No. 10/989,023, now United States Patent No. 8,122,128, and claims priority to United States Provisional Application No. 60/523,057 filed on November 18, 2003.   A true and correct copy of the '468 Patent is attached hereto as Exhibit A.

7.     The USPTO, and technology leaders including Apple Computer, Inc., Time Warner Cable, and Sony Computer Entertainment, have cited the '468 Patent over 130 times.     *See*   https://patents.google.com/patent/US8799468B2/-en?oq=8%2c799%2c468+#citedBy (last accessed July 2, 2018).

3

8.     On August 11, 2017, Unified Patents Inc. filed a 105-page Petition (with 14 exhibits) before the United States Patent Trial and Appeal Board ("PTAB") pursuant to 35 U.S.C. §§311–319 seeking to institute an inter partes review of Claims 1–5, 9, 11–13, 19, 23–27, and 32–34 of the '468 Patent.  Unified Patents argued that the claims were obvious and therefore invalid under 35 USC §103.  Applying the standard set forth in 35 U.S.C. § 314(a), which requires that Petitioner demonstrate a reasonable likelihood that it would prevail with respect to at least one challenged claim, the Board denied the Petition.  See Exhibit E attached (Decision Denying Institution of *Inter Partes* Review in IPR2017-01934, March 5, 2018).  "We also conclude Petitioner has not demonstrated a reasonable likelihood of prevailing. . . ." *Id*. at 15.

9.     The USPTO duly and legally issued United States Patent No. 9,465,925 ("the '925 Patent") entitled "System for Regulating Access to and Distributing Content in a Network" to Robert M. Burke II and David Z. Carman on October 11, 2016.  The '925 Patent claims priority to U.S. Patent App. No. 13/369,174 (now the '468 Patent), and claims priority to United States Provisional Application No. 60/523,057 filed on November 18, 2003.  A true and correct copy of the '925 Patent is attached hereto as Exhibit B.

10.     The USPTO, and technology leaders including Time Warner Cable and Sony Computer Entertainment, have cited the '925 Patent over 130 times.  *See* https://patents.google.com/patent/US9465925#citedBy (last accessed March 3, 2018).

11.     MCM is the assignee of all right, title, and interest to both the '468 Patent and the '925 Patent ("the Patents-in-suit").  Accordingly, MCM has standing to bring the instant suit to enforce its rights under the patent laws of the United States, including the right to collect damages for past infringement.

12.     MCM has not practiced any claimed invention of the Patents-in-suit.

13.     The Patents-in-suit describe and claim systems and methods for regulating access to a service provider network.

14.     The Patents-in-suit describe systems and methods to rapidly and efficiently deliver content, such as music, video, games, broadband data, real-time audio or voice applications, and software, to subscribers while respecting the rights of the owners of the intellectual property that protect such content.  '468 Patent, at 1:24–51; '925 Patent, at 1:30–59.

15.     The specifications of the Patents-in-suit recount the reluctance of the owners of proprietary content, including those in the motion picture industry, to provide their content over the internet "having seen the negative impact that piracy has already had on the Music Recording Industry."  '468 Patent, 1:60–62; '925 Patent, 2:1–3.

16.     To avoid a similar fate, service providers—like cable TV providers and content providers—like the motion picture industry—needed some assurance that their "intellectual property (music, video, games, software, etc.) will be secure from illegal downloading and transmission over the [otherwise insecure] Internet."  '468 Patent, 1:60–63; '925 Patent, 2:1–3.

5

17.     Regulating access to proprietary content to customers connected via a network in the manner claimed in the '468 and '925 Patents solved technical problems previously existing in the field of digital content distribution.  For example, the Patents-in-suit describe systems and methods for providing "a gateway unit associated with a user [that] receives controller instructions from the network" such that when "a gateway unit receives a network access request from a user" the "gateway unit selectively transmits the network access request[] over the network" only in "accordance with . . . controller instructions."  '468 Patent, 8:54–61; '925 Patent, 8:12–21.  Thus, the customer only receives authorized content, which allows content providers to make more content available through their networks.

18.     Prior to the inventions of the '925 and '468 Patents, "[s]ervice providers and content providers need[ed] the assurance that the[ir] intellectual property (music, video, games, software, etc.)" would be "secure from illegal downloading and transmission over the Internet," which had become "a major source of lost revenues and the basis for hundreds of lawsuits."  '468 Patent, 1:52–56; '925 Patent, 1:60–64.

19.     The '925 and '468 Patents describe "[t]echniques that reduce the strain on a content provider's resources" and "improve the speed and efficiency of accessing content in a network."  '468 Patent, 1:66–2:2; '925 Patent, 2:7–11.

20.     The computer techniques described in the '925 and '468 Patents also "reduce the . . . volume[] of network data traffic" by efficiently managing the distribution of proprietary content.  '468 Patent, 1:66–2:2; '925 Patent, 2:7–11.

21.     The specifications of the Patents-in-suit explain, for example that the claimed systems and methods may deny "subscribers the capability to send or to receive data from or to 'pirate' URLs or IP addresses that are known to contain unlicensed copyrighted material." '468 Patent, 7:65–8:6; '925 Patent, 8:24–32.  The claimed techniques enable the network to direct that only authorized sources can access the requested content.

22.     The '925 and '468 Patent describe systems and methods that include "communication gateways, installed at a subscriber site, internet control points, installed remotely, and various network elements installed throughout the network." '468 Patent, at Abstract; '925 Patent, at Abstract.  "The communication gateways and network elements operate in conjunction with the internet control points to restrict or allow access to specified Internet sites and to manage efficient distribution of content."  *Id*.

23.     The Patents-in-suit describe methods that use "a controller node coupled to the network" and the "controller node [includes] a . . . processor for generating controller instructions."  '468 Patent, at 2:24–28; '925 Patent, at 2:33–38.  The controller node also includes a "network interface for transmitting the controller instructions over the network."  '468 Patent, at 2:27–28; '925 Patent; 2:37–38.

24.     The systems and methods can also use one or more gateway units, which are components that include "a user interface [that can] receiv[e] user-entered network access requests."  '468 Patent, at 2:28–38; '925 Patent, at 2: 38–48.

7

25.     There can also be "a second network interface coupled to the network [to] receiv[e] controller instructions from the network and a second processor, [where] the second processor selectively transmit[s] at least some of the network access requests over the network in accordance with the controller instructions."  468 Patent, at 2:28–38; '925 Patent, at 2:38–48.

26.     Claims of the Patents-in-suit also recite systems and methods for "regulating access to a service provider network."  '468 Patent, at 20:59–60 (Claim 23); '925 Patent, at 21:36–37 (Claim 29).

27.     The '925 and '468 Patents describe systems and methods that include "a controller node [that is] coupled to the network" where the "controller node [includes at least one] processor [that] generates controller instructions."  '468 Patent, at 2:53–59; '925 Patent, at 2:63–3:2.

28.     The '468 and '925 Patents also describe one or more "network units" that can include "a second network interface coupled to the network," where "the second network interface in at least . . . one of the network units receiv[es] controller instructions from the network."  '468 Patent, at 2:39–52; '925 Patent, at 2:49–62.

29.     The second network interface component can also "receiv[e] a portion of a content data file from at least a second one of the network units and a second processor."  '468 Patent, at 2:39–52; '925 Patent, at 2:49–62.

30.      The "second processor in the at least first one of the network units" is a component that can "selectively forward [a] portion of the content data file received from . . . one of the network units to at least a third . . . network unit," all "in

accordance with the controller instructions." '468 Patent, at 2:39–52; '925 Patent, at 2:49–3:13.

31.    Fig. 1 of the '925 Patent illustrates an architecture that is a "collection of hardware components and software routines executed by the components." '925 Patent, col. 3, ll. 46-49.



Figure 1

From the top of Fig. 1, an internet service provider 62 works in conjunction with communication gateways 58. Components 56 and 57 have proprietary digital content delivered by using, in part, an otherwise insecure network such as the internet (item 52 in Fig. 1). Subscriber terminals, $60_1$ through $60_n$, can include various devices including television monitors and computers. Communication gateways "operate in conjunction" with the internet service provider "under the control of 'controller nodes,'" which in Fig. 1 is labeled as "internet control point" 50. '925 Patent col. 3, ll.

9

55-58.  "The software routines located in" the communications gateways and the controller nodes "provide a suite of features for the system." *Id*. at ll. 60-65.  The controller nodes "control subscriber access to web sites and . . . deliver data to subscribers." *Id*. at 66-67.

32.     The Patents-in-suit describe systems and methods for "the delivery of electronic data or content such as music, video, games, broadband data, real-time audio and voice applications, and software to subscribers . . . while also protecting the rights of the owners of content, that is, the owners of intellectual property." '468 Patent, at 1:24–28; 42–51; '925 Patent, at 1:30–34, 49–56.

33.     Content can be downloaded to a subscriber's set-top box ("STB") yet remain under the control of the access regulation system.  For example, a subscriber may download a movie at one time and later resume watching the movie after taking a break.  That feature reduces network and internet traffic and speeds up the flow of traffic on the network.

34.     The Patents-in-suit solve technical problems that arose in the context of providing internet services: "The . . . Internet, [and] any similar private or managed network, provides a convenient medium for the delivery of electronic data or content such as music, video, games, broadband data, real-time audio and voice applications, and software to subscribers," but that convenient medium for the delivery of electronic data produced some serious problems.  '468 Patent, at 1:24–28; '925 Patent; at 1:30–34.  "Recent music industry lawsuits over the distribution of pirated music . . . evidence[d] the difficulties" that could not be solved by digital rights

10

management laws and policies alone. '468 Patent, at 1:49–52; '925 Patent, at 1:56–59.

35.   Before, "content providers" would make digital copies of their materials available for electronic distribution they "need[ed] assurance that the intellectual property (music, video, games, software, etc.) [would] be secure from illegal downloading and transmission over the Internet," which the music industry had shown was "a major source of lost revenues and the basis for hundreds of lawsuits." '468 Patent, at 1:52–55; '925 Patent, at 1:60–64.

36.   The techniques described in the '925 and '468 Patents "reduce the strain on . . . content provider's resources" and also reduce the "volume[] of network data traffic" which "improve the speed and efficiency of accessing content in a network." '468 Patent, at 1:66–2:2; '925 Patent, at 2:8–11.

37.   Claim 23 of the '468 Patent recites "selectively transmitting, by the plurality of gateway units, the content requests to the service provider network in accordance with the controller instructions." '468 Patent, at 21:3–5; *see also* '925 Patent, at 21:45–48 (Claim 29 reciting "selectively transmitting, by the plurality of network elements, the content requests to the service provider network in accordance with the controller instructions.").

38.   Selectively transmitting content requests in accordance with controller instructions reduces the volume of network data traffic and improves the speed and efficiency of accessing content in a network.

39.     The '468 and '925 Patents describe an approach to solving a technical problem: "to provide new access regulation and data traffic control techniques that can be made available to telephone line carriers, ISPs, enterprises, [and] cable television companies, for their Internet access networks." '468 Patent, at 2:11–14; '925 Patent, at 2:21–24.

40.     DISH operates a network to provide, among other services, TV and video-on-demand (VOD) services to its customers.  The DISH network includes a data center and a distribution network.  The data center has a collection of computing resources, such as servers and memory storage devices, to manage, store, and deliver content over the distribution network, including video on-demand movies, to customers.

41.     The DISH network also includes STBs, such as the "Hopper" family of receivers, including the Hopper 3, Hopper Duo, Hopper, and Wally, for lease to its subscribers.

42.     Set-Top Boxes are located in subscriber homes, connect to the DISH network, and allow subscribers to view television programs, record shows and movies, and purchase pay-per-view movies and other programming content (such as special events and other on-demand shows).

43.     While the STBs are located within subscriber homes, DISH maintains ownership and control of the STBs.

44.     Movies and other programming (special events, on-demand shows, and other on-demand programming content) purchased on demand are generally referred

to as impulse pay per view ("IPPV") (hereinafter "IPPV content").  With the DISH service, customers can order IPPV content using a remote control in conjunction with a STB.  Ordering IPPV content is accomplished through the use of an interactive program guide ("IPG") (e.g. displayed on a TV) that enables the user to select from options to confirm content purchases.

45.     Once IPPV content is purchased (or rented) by a subscriber, the subscriber typically has 24 hours to watch the IPPV content.  IPPV content, such as a movie, can be watched as many times as practical within the 24-hour rental window.  During this window, the subscriber can watch the IPPV content on multiple channels via the "All Day DISH Ticket."

46.     A DISH data center transmits control instructions to the STBs.  Control instructions include Digital Rights Management (DRM) messages used to control access to certain content.  Control instructions also include updated firmware and software for the STBs, as well as updated instructions for implementing and updating the IPG.

47.     When the DISH data center updates the IPG of a STB, the DISH data center sends the DRM messages to the STB.  The DRM messages indicate, among other things, whether content may be available for a limited time. According to DISH's website, DRM "is a systematic approach to copyright protection, focusing on making it impossible to steal content in the first place. All pay TV providers, including DISH, are required to apply protection like limited recording or high-bandwidth

digital content protection (HDCP) to select content."  See, e.g., (last accessed July 2, 2018):

https://www.mydish.com/support/drm;

https://rvseniormoments.files.wordpress.com/2016/01/h3_hopper3.pdf;

http://about.dish.com/2016-01-05-DISH-Unveils-Hopper-3-with-Enhanced-4K-Experience-Most-Simultaneous-Recording-Processing-Power-of-Any-DVR-Announces-HopperGO-for-Offline-Viewing-of-Recorded-Content?asPDF=1;

https://rvseniormoments.com/tech-docs/dish-tv-for-rvs/hopper-3-use-in-an-rv/hopper-3-the-winegard-travler/;

http://dishnetwork.ws/dpf/Hopper+3+Packet.pdf;

https://www.mydish.com/support/same-video-2-tvs;

https://www.mydish.com/support/products/hopper/how-to/manage/live-tv; and

https://www.mydish.com/filestream.ashx?ID=14292.

## COUNT I

### (INFRINGEMENT OF U.S. PATENT NO. 8,799,468)

48.     Plaintiff incorporates the above paragraphs by reference.

49.     The '468 Patent is presumed valid.

50.     Plaintiff is the sole owner of the '468 Patent.

51.     DISH uses, offers for sale, and sells in the United States TV and video-on-demand ("VOD") products and services, including network-related services that involve a data center and media devices, such as, but not limited to, the Hopper 3

DVR with Joey receivers ("Accused DVR Device") (collectively, the "Accused Product").

52.    Through the use, offer for sale, and sale of the Accused Product, DISH directly infringed and continues to infringe at least Claim 23 of the '468 Patent, which recites:

23. A method for regulating access to a service provider network, the method comprising:

generating, by a controller node coupled to the service provider network, controller instructions;

transmitting the controller instructions, by the controller node, to a plurality of gateway units of the service provider network;

receiving, by the gateway units, user-entered content requests for the service provider network;

receiving, by the gateway units, from the controller node, the controller instructions;

selectively transmitting, by the plurality of gateway units, the content requests to the service provider network in accordance with the controller instructions; and

transferring, by the gateway units, received content data responsive to the transmitted content requests from the service provider network.

'468 Patent, at 20:59–21:9.

53.     Exhibit C, attached hereto, includes a claim chart that shows how each and every element of Claim 23 of the '468 Patent is found in the Accused Product.

54.     Viewed in light of the specification of the '468 Patent, the claims are ***not directed*** to basic tools of scientific and technological work, nor are they directed to a fundamental economic practice. For example, the '468 Patent describes a system for "regulating access and managing distribution of content in a network, such as the Internet. The system includes communication gateways, installed at a subscriber site, internet control points, installed remotely, and various network elements installed throughout the network." '468 Patent, at Abstract.

55.     The '468 Patent claims are ***not directed*** to the use of an abstract mathematical formula on any general-purpose computer, or a purely conventional computer implementation of a mathematical formula, or generalized steps to be performed on a computer using conventional activity. For example, the '468 Patent describes the use of specific electronic devices, including controller nodes and gateway units. '468 Patent, at 20:59–21:9. The specific electronic devices, including controller nodes and gateway units, regulate access and manage distribution of content in a network through the use of specific content requests and controller instructions. '468 Patent, at 20:59–21:9.

56.     The '468 Patent claims are ***not directed*** to a method of organizing human activity or to a fundamental economic practice long prevalent in our system of commerce.  The '468 Patent describes an approach to solving a technical problem: "to provide new access regulation and data traffic control techniques that can be made

available to telephone line carriers, ISPs, enterprises, [and] cable television companies, for their Internet access networks." '468 Patent, at 2:11–14.

57.     The '468 Patent ***does not*** take a well-known or established business method or process and apply it to a general-purpose computer. The '468 Patent describes a system and method that uses specific components to solve the technical problem of providing access regulation and data traffic control techniques. For example, the '468 Patent describes using "a gateway unit associated with a user" to receive "controller instructions from the network." The gateway unit "receives a network access request from a user, via a subscriber terminal," and "selectively transmits the network access requests over the network in accordance with the controller instructions." The gateway unit also "receives content data responsive to the transmitted network access request from the network." '468 Patent, at 7:54–65.

58.     As noted by United States Patents, foreign patent documents, and other publications cited by the '468 Patent, the '468 Patent ***does not*** preempt the field of its invention or preclude use of other methods or systems of regulating access to a service provider network.

59.     The Accused DVR Device and the other information included in the attached claim charts, see Exhibit C, are non-limiting examples that were identified based on publicly available information, and Plaintiff reserves its right to identify additional infringing activities, products and services, including, for example, on the basis of information obtained during discovery.

60.     DISH has infringed, and continues to infringe, at least one claim of the '468 Patent (*e.g.*, claim 23) in the United States by making, using, offering for sale, selling, or importing the Accused Product in violation of 35 U.S.C. § 271(a). *See, e.g.*, Preliminary Claim Chart (Exhibit C).

61.     Plaintiff has been damaged by DISH's infringement of the '468 Patent.

62.     DISH has had actual knowledge of the '468 Patent since at least the service of this Complaint.

63.     At least as early as service of this Complaint, DISH indirectly infringes the '468 Patent within the United States by inducement under 35 U.S.C. § 271(b). By failing to cease making, using, selling, importing, and/or offering for sale the Accused Product at least as of the service of this Complaint, Defendants have knowingly and intentionally induced users of the Accused Products to directly infringe one or more claims of the '468 Patent, inter alia, by: (1) providing instructions or information, for example on its publicly available website, to explain how to use the Accused Product in an infringing manner, including the use of the Accused Product in manners described above, which are expressly incorporated herein; and (2) touting these infringing uses of the Accused Product in advertisements, including but not limited to, those on its website.

18

## COUNT II

### (INFRINGEMENT OF U.S. PATENT NO. 9,465,925)

64.     Plaintiff incorporates the above paragraphs by reference.

65.     The '925 Patent is presumed valid.

66.     Through the use, offer for sale, and sale of the Accused Product, DISH infringes and continues to infringe at least Claim 29 of the '925 Patent, which recites:

29. A method for regulating access to a service provider network, the method comprising:

generating, by a controller node coupled to the service provider network, controller instructions;

transmitting the controller instructions, by the controller node, to a plurality of network elements of the service provider network;

receiving, by the network elements, content requests for the service provider network;

selectively transmitting, by the plurality of network elements, the content requests to the service provider network in accordance with the controller instructions; and

transferring, by the network elements, received content data responsive to the transmitted content requests from the service provider network.

'925 Patent, at 21:36–51.

67.     Exhibit D, attached hereto, includes a claim chart that shows how each and every element of Claim 29 of the '925 Patent is found in the Accused Product.

68.     Viewed in light of the specification of the '925 Patent, the claims are ***not directed*** to basic tools of scientific and technological work, nor are they directed to a fundamental economic practice.  For example, the '925 Patent describes a system for "regulating access and managing distribution of content in a network, such as the Internet. The system includes communication gateways, installed at a subscriber site, internet control points, installed remotely, and various network elements installed throughout the network."  '925 Patent, at Abstract.

69.     The '925 Patent claims are ***not directed*** to the use of an abstract mathematical formula on any general-purpose computer, or a purely conventional computer implementation of a mathematical formula, or generalized steps to be performed on a computer using conventional activity.  For example, the '925 Patent describes the use of specific electronic devices, including controller nodes and network elements. '925 Patent, at 21:36–48.   The specific electronic devices, including controller nodes and network elements, regulate access and manage distribution of content in a network through the use of specific content requests and controller instructions.  '925 Patent, at 21:36–48.

70.     The '925 Patent claims are ***not directed*** to a method of organizing human activity or to a fundamental economic practice long prevalent in our system of commerce.  The '925 Patent describes an approach to solving a technical problem: "to provide new access regulation and data traffic control techniques that can be made

available to telephone line carriers, ISPs, enterprises, [and] cable television companies, for their Internet access networks." *Id.* at 2:21–24.

71.     The '925 Patent ***does not*** take a well-known or established business method or process and apply it to a general-purpose computer.  The '925 Patent describes a system and method that uses specific components to solve the technical problem of providing access regulation and data traffic control techniques.  For example, the '925 Patent describes using "a gateway unit associated with a user" to receive "controller instructions from the network."  The gateway unit "receives a network access request from a user, via a subscriber terminal," and "selectively transmits the network access requests over the network in accordance with the controller instructions."  The gateway unit also "receives content data responsive to the transmitted network access request from the network."  '925 Patent, at 8:11–23.

72.     As noted by the United States Patents, foreign patent documents, and other publications cited by the '925 Patent, the '925 Patent ***does not*** preempt the field of its invention or preclude use of other methods or systems of regulating access to a service provider network.

73.     The Accused DVR Device and the other information included in the attached claim charts, *see* Exhibit D, are non-limiting examples that were identified based on publicly available information, and Plaintiff reserves its right to identify additional infringing activities, products and services, including, for example, on the basis of information obtained during discovery.

74.     DISH has infringed, and continues to infringe, at least one claim of the '925 Patent (*e.g.*, Claim 29) in the United States by making, using, offering for sale, selling, or importing the Accused Product in violation of 35 U.S.C. §271(a). *See, e.g.*, Preliminary Claim Chart (Exhibit D).

75.     Plaintiff has been damaged by DISH's infringement of the '925 Patent.

76.     DISH has had actual knowledge of the '925 Patent since at least the service of this Complaint.

77.     At least as early as service of this Complaint, DISH indirectly infringes the '925 Patent within the United States by inducement under 35 U.S.C. § 271(b). By failing to cease making, using, selling, importing, and/or offering for sale the Accused Product at least as of the service of this Complaint, Defendants have knowingly and intentionally induced users of the Accused Products to directly infringe one or more claims of the '925 Patent, inter alia, by: (1) providing instructions or information, for example on its publicly available website, to explain how to use the Accused Product in an infringing manner, including the use of the Accused Product in manners described above, which are expressly incorporated herein; and (2) touting these infringing uses of the Accused Product in advertisements, including but not limited to, those on its website.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the Court:

A.     Enter judgment that Defendant has infringed one or more claims of the '468 Patent literally or under the doctrine of equivalents;

B.      Enter judgment that Defendant has induced infringement and continues to induce infringement of one or more claims of the '468 patent;

C.      Enter judgment that Defendant has infringed one or more claims of the '925 Patent literally or the doctrine of equivalents;

D.      Enter judgment that Defendant has induced infringement and continues to induce infringement of one or more claims of the '468 patent;

E.      Award Plaintiff past and future damages, to be paid by Defendant, in an amount no less than a reasonable royalty and adequate to compensate Plaintiff for such past and future damages, together with pre-judgment and post-judgment interest for Defendant's infringement of the '468 Patent and the '925 Patent through the date that such judgment is entered in accordance with 35 U.S.C. §284, and increase such award by up to three times the amount found or assessed in accordance with 35 U.S.C. §284;

F.      Declare this case exceptional pursuant to 35 U.S.C. §285; and

G.      Award Plaintiff its costs, disbursements, attorneys' fees, and such further and additional relief as is deemed appropriate by this Court.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  July 25, 2018                    Respectfully submitted,

                                By:    */s/Craig S. Jepson*
                                       Craig S. Jepson
                                       Texas State Bar No. 24061364
                                       Benjamin Johnson
                                       Texas State Bar No. 24065495
                                       (*pro hac* vice to be filed)

                                       **TOLER LAW GROUP, PC**
                                       8500 Bluffstone Cove, Suite A201
                                       Austin, Texas 78759
                                       Tel. (512) 327-5515
                                       Fax (512) 327-5575
                                       cjepson@tlgiplaw.com
                                       bjohnson@tlgiplaw.com

                                       **ATTORNEYS FOR PLAINTIFF**
                                       **MULTIMEDIA CONTENT**
                                       **MANAGEMENT LLC**