# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| MULTIMEDIA CONTENT | § | Civil Action No.: 6:18-cv-00207-ADA |
| MANAGEMENT LLC, | § | |
|     Plaintiff | § | |
| | § | JURY TRIAL DEMANDED |
| v. | § | |
| | § | PATENT CASE |
| DISH NETWORK L.L.C., | § | |
|     Defendant. | § | |
| | § | |

## DEFENDANT'S OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  GENERAL LEGAL PRINCIPLES OF CLAIM CONSTRUCTION ............................. 1

III. CONSTRUCTION OF INDEPENDENT CLAIM TERMS ............................................ 3

   A.   Term 1: "to generate controller instructions" ('468: Claim 1 / '925: Claim 1) or "generating controller instructions" ('468: Claim 23 / '925: Claim 29) .................. 3

   B.   Term 2: "a controller node" ('468: Claims 1 and 23 / '925: Claims 1 and 29) ........ 7

   C.   Term 3: "a service provider network" ('468: Claims 1 and 23 / '925: Claims 1 and 29) ................................................................................................................... 11

   D.   Term 4: "selectively transmit[ting, by the plurality of gateway units,] the content requests to the service provider network in accordance with the controller instructions" ('468: Claims 1 and 23 / '925: Claims 1 and 29) ............................... 17

   E.   Term 5: "gateway units" ('468: Claims 1 and 23) / "gateway nodes" ('468 Claim 27) ................................................................................................................... 19

   F.   Term 6: "network elements" ('925: Claims 1 and 29) ............................................. 22

IV.  CONSTRUCTION OF DEPENDENT CLAIM TERMS ............................................... 23

   A.   Term 1: "if the gateway unit enters the inactive state" ('468: Claim 29) ............... 24

   B.   Term 2: "registration information" ('468: Claim 33) ............................................. 26

   C.   Term 3: "uniquely" ('468: Claim 24) .................................................................... 27

   D.   Term 4: "initial operating parameters" ('468: Claim 33) ....................................... 28

   E.   Term 5: "subscriber management system" ('925: Claim 25) .................................. 29

   F.   Term 6: "authenticate subscribers or devices before allowing access into the service provider network" ('925: Claim 25) ............................................................ 29

   G.   Term 7: "further enable the gateway units to receive additional software" ('468: Claim 15) ............................................................................................................ 30

   H.   Term 8: "user-controlled operational mode" ('468: Claim 30 / '925: Claim 36) ... 30

V.   CONCLUSION ................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Altiris, Inc. v. Symatec Corp.*,
318 F.3d 1363 (Fed. Cir. 2003)................................................................2

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
637 F.3d 1324 (Fed. Cir. 2011)........................................................2, 8, 16

*Andersen Corp. v. Fiber Composites, LLC*,
474 F.3d 1361 (Fed. Cir. 2007).........................................................2, 16

*Aylus Networks, Inc. v. Apple Inc.*,
856 F.3d 1353 (Fed. Cir. 2017)................................................... *passim*

*Bates v. Coe*,
98 U.S. 31 (1878)........................................................................17

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*,
224 F.3d 1308 (Fed. Cir. 2000)..............................................................22

*Computer Docking Station Corp. v. Dell, Inc.*,
519 F.3d 1366 (Fed. Cir. 2008).........................................................3, 4

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014)............................................................23

*In re Gabapentin Patent Litigation*,
503 F.3d 1254 (Fed. Cir. 2007).............................................................10

*In re Johnston*,
435 F.3d 1381 (Fed. Cir. 2006)............................................................18

*The Medicines Co. v. Mylan, Inc.*,
853 F.3d 1296 (Fed. Cir. 2017)............................................................18

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005).................................................. *passim*

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
659 F.3d 1376 (Fed. Cir. 2011).............................................................21

STATUTES

35 U.S.C. § 101...............................................................................1

## INDEX OF EXHIBITS

Ex. A.      *Unified Patents, Inc. v. Multimedia Content Management LLC*, IPR2017-01934, Paper 9 (Patent Owner Preliminary Response) (PTAB Dec. 14, 2017)

Ex. B       The American Heritage Dictionary (4th Edition 2000)

Ex. C       The Computer Glossary The Complete Illustrated Dictionary (7th Edition 1995)

Ex. D       Newton's Telecom Dictionary (15th Edition 1999)

Ex. E       Declaration of Anthony Wechselberger

Ex. F       U.S. Patent No. 8,122,128 File History, Oct. 26, 2009 Non-Final Office Action

Ex. G       U.S. Patent No. 6,516,416 to Gregg *et al.*

Ex. H       U.S. Patent No. 8,122,128 File History, Jan. 26, 2010 Response to Non-Final Office Action

Ex. I       U.S. Patent No. 5,987,611 to Freund

Ex. J       *Unified Patents, Inc. v. Multimedia Content Management LLC*, IPR2017-01934, Paper 10 (Institution Decision) (PTAB Mar. 5, 2018)

Ex. K       Email Communication from Ben Johnson to Thomas Carter, Mar. 1, 2019

Ex. L       Microsoft Press Computer Dictionary (3rd Edition 1997)

## I.  INTRODUCTION

Plaintiff Multimedia Content Management, LLC ("MCM") asserts U.S. Patent No. 8,799,468 (the "'468 Patent") and U.S. Patent No. 9,465,925 (the "'925 Patent") (collectively, the "Asserted Patents") against Defendant DISH Network L.L.C. ("DISH").  The Asserted Patents share the same specification and have nearly identical independent claims.  Both patents relate to a computer implementation of controlling access to content.

The claim construction process must consider the substantial evidence that forms the intrinsic record for these claims.  First, during prosecution of the parent patent to the Asserted Patents, U.S. Patent No. 8,122,128 (the "'128 Patent"), the Applicant made numerous claim amendments and arguments regarding the scope of the claims to overcome prior art rejections.  Second, the '468 Patent faced a prior validity challenge in the form of an *inter partes* review ("IPR") petition filed with the Patent Trial and Appeal Board ("PTAB").  To preserve the validity of the '468 Patent during those proceedings, MCM made additional arguments regarding the scope and coverage of the same claim limitations before this Court now.  Finally, DISH filed a motion to dismiss this action on the ground that the Asserted Patents are invalid under 35 U.S.C. § 101.  As a part of that motion, MCM made several concessions in briefing regarding the scope of the claims of the Asserted Patents.

All of these statements inform the proper construction and full scope of the claims of the Asserted Patents.  MCM's proposed constructions ignore its own concessions made during prosecution, the related IPR proceedings, and in front of this Court.  Only DISH's constructions properly interpret the claim language in view of the complete record.

## II.  GENERAL LEGAL PRINCIPLES OF CLAIM CONSTRUCTION

In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), an *en banc* panel of the Federal Circuit explained the basic principles governing claim construction:

- "the claims themselves provide substantial guidance as to the meaning of particular claim terms," *id.* at 1314;

- the specification, of which the claims are a part, is the primary basis for construing claims, *id.* at 1315;

- the prosecution history should also be considered, since it "can often inform the meaning of the claim language" or contain disclaimers of claim scope, *id.* at 1317; and

- extrinsic evidence may be useful because it "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean." *Id.* at 1319.

However, preferred embodiments found in the specification cannot be used to limit claim language that has a broader meaning. *Altiris, Inc. v. Symatec Corp.*, 318 F.3d 1363, 1370 (Fed. Cir. 2003). Claims are "'generally given their ordinary and customary meaning,'" which "is the meaning that the term would have to a person or ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312-13.

Additionally, "an applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well." *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir. 2007) (internal citations omitted). As with patent prosecution, statements made by a patent owner during IPR proceedings put the public on notice of how the patent owner views its patent and may constitute disclaimer of claim scope. *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017) ("Extending the prosecution disclaimer doctrine to IPR proceedings will ensure that claims are not argued one way in order to maintain their patentability and in a different way against accused infringers."). Even if not expressly adopted, the public is still entitled to rely on the patent owner's interpretation. *See Am. Piledriving*

*Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011) (explaining that "regardless of whether the examiner agreed with" a patent owner's statements, those "statements still inform the proper construction of the term").

## III. CONSTRUCTION OF INDEPENDENT CLAIM TERMS

### A. Term 1: "to generate controller instructions" ('468: Claim 1 / '925: Claim 1) or "generating controller instructions" ('468: Claim 23 / '925: Claim 29)

| MCM's Construction | DISH's Construction |
|---|---|
| "generate computer processor-executable instructions, excluding merely a uniform resource locator (URL) or an internet protocol (IP) address" | "to create[ing] or bring[ing] into being computer executable instructions that determine whether to transmit or not transmit a content request from a user to the service provider network" |

The parties' dispute centers on what it means to "generate" instructions, a term used by all claims of the Asserted Patents. DISH's construction prevents MCM from reclaiming subject matter that it expressly disavowed during IPR proceedings. *See, e.g.*, *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1379 (Fed. Cir. 2008) (a patent owner "cannot recapture claim scope disavowed during prosecution to prove infringement").

### 1. DISH's Proposed Construction Reflects the Meaning of the Claimed "Generating" Limitation Based on the Intrinsic Evidence

The intrinsic evidence, including the specification and MCM's unequivocal statements made during IPR proceedings, support DISH's construction that "generating" means "creating" or "bringing into being." *See Aylus*, 856 F.3d at 1360 (applying prosecution disclaimer to IPR). By this construction, DISH seeks to limit the scope of the term "generate" to properly reflect the admissions MCM made regarding claim scope in opposing Unified Patents' IPR. In particular, as shown further below, MCM argued that when controller instructions are "transmitted" or "relayed," the instructions do not fall within the scope of the claimed "generating" term. *See* Ex. A (*Unified Patents, Inc. v. Multimedia Content Management LLC*, IPR2017-01934, Paper 9,

Patent Owner Preliminary Response (PTAB Dec. 14, 2017) (hereinafter "POPR") at 12 ("A POSITA would understand the meaning of *'generate,'* in the context of the recited claims, to **exclude operations in which the controller instructions are only transmitted or are relayed** (i.e., received and then transmitted) by a device.") (emphasis added); *see also id.* at 12-14. MCM's construction improperly ignores their IPR disclaimer altogether. *See, e.g.*, *Computer Docking Station*, 519 F.3d at 1379.

The specification provides no guidance on "generating" controller instructions. The "generate" term appears once in the specification in relation to the "controller instructions." That portion states that "CG 58 may also include . . . a memory device 104 including a database for storing ICP-generated instructions." '468 Patent at 6:28-31. MCM's citations to the specification regarding "generate" provide no clarity on what the term means. *See, e.g.*, *id.* at 5:19-23. The Court should therefore look to the statements that MCM made during IPR as part of the prosecution history. *See Aylus*, 856 F.3d at 1361 ("[S]tatements made by a patent owner during an IPR proceeding can be considered during claim construction and relied upon to support a finding of prosecution disclaimer.").

Here, in circular fashion MCM uses the term "generate" in its proposed construction for "to generate controller instructions," thus offering no definition for "generate." In the prior IPR proceeding, however, MCM construed "generate" to require the instructions not be pre-existing and expressly excluded merely "transmitting" or "relaying" pre-existing controller instructions. Ex. A (POPR) at 12-13:

> Common with each of these definitions of "generate," and missing from Petitioner's proposed construction, is the notion that **the generated item did not exist prior to being generated**. (EX2001, ¶¶78-80) (e.g., "bring into being"). Consistent with these definitions, what is required for a proper understanding of generate with respect to the '468 Patent is that **at the time when the processor generates controller instructions, the controller instructions did not previously**

***exist*** . . .

***Transmitting or retransmitting*** an existing "controller instruction" is ***not*** "***generating***" as understood by a POSITA.

*Id.* at 12-13 (emphasis added).

Thus, the term "generate" should be properly construed as "create" or "bring into being" thereby excluding a construction encompassing "transmitted" or "relayed" instructions. *See* Ex. A (POPR) at 13 ("generated item did not exist prior to being generated").

The understanding that "generate" means "to create or bring into being" comports with the plain and ordinary meaning of "generate" and MCM's pre-lawsuit intended construction of the "generate" term. For example, the American Heritage Dictionary defines "generate" as "to bring into being; give rise to." Ex. B (The American Heritage Dictionary (4th Edition 2000)). MCM provides no dictionary definitions or other extrinsic evidence that supports the concept that "generate" means to "relay" or "transfer." Given that dictionary definitions can be "useful to assist in understanding the commonly understood meaning of words," the extrinsic evidence further supports DISH's construction. *Phillips*, 415 F.3d at 1322.

2.     *DISH's Proposed Construction Reflects the Meaning of the Claimed "Controller Instructions" as Intended by the Intrinsic Evidence*

The claims and specification show that "controller instructions" are "computer executable instructions that determine whether to transmit or not transmit a content request from a user to the service provider network." As an initial matter, the parties agree that the claimed "controller instructions" are "executable."

Beyond that limitation, MCM's construction falls short of providing any meaningful guidance as to what "controller instructions" are in the context of the claims. All claims recite selectively transmitting "the content requests to the service provider network ***in accordance with the controller instructions***." '468 Patent at Claim 1, 23 (emphasis added). Thus, the claims

establish that controller instructions are for "determining" whether the content requests should be transmitted or not transmitted. MCM's construction of the term "selectively transmit" confirms that the determining function is for the "controller instructions." *See infra* at III.D. MCM's proposed construction states that "selectively transmitting" is "executing previously received ***controller instructions to determine whether to transmit a content request from a user or to take other action*** (e.g., deny the content request, redirect the content request, or notify authorities regarding the content request)." *Id.* MCM thus agrees that the "controller instructions" perform the "determining" function, but MCM links that function to the "selectively transmitting" term. The clause "determining whether to transmit or not transmit" is more appropriately included in the construction of "controller instructions" because that determination aligns with the function and purpose of the "controller instructions" in the context of the claims: the transmission of the content requests from a user to the service provider network.

Instead of providing meaningful guidance as to the function of "controller instructions" within these claims, MCM needlessly includes the clause "excluding merely a uniform resource locator (URL) or an internet protocol (IP) address" in its construction. The intrinsic record does not support this additional negative limitation and the limitation only complicates the term.

Based on MCM's disclaimer in the IPR proceedings and the claim language as a whole, the term "generating controller instructions" should be construed as "bringing into being or creating computer executable instructions that determine whether to transmit or not transmit a content request from a user to the service provider network."

**B.     Term 2: "a controller node" ('468: Claims 1 and 23 / '925: Claims 1 and 29)**

| MCM's Construction | DISH's Construction |
|---|---|
| "a network-based router or computer located within the network and remote from the [gateway unit / network element] and that controls the operation of one or more [gateway units / network elements]" | "a single network device that controls the operation of the gateway units" |

Both proposed constructions require that the controller node must "control the operation of the gateway units."  MCM's concessions to the PTAB during the IPR of the '468 Patent establish that "a controller node" must be a "a single network device"—rather than multiple devices acting independently or as a collection to perform the activities of the controller node. MCM, in contrast, proposes a generic and unhelpful definition for "node" that imports an exemplary description that sets the "controller node" "within the network and remote from the gateway unit" and, critically, interprets the term to remove the antecedent basis established by the article "a."

1.     *MCM's Statements in IPR Proceedings and the Claims Define "A Controller Node" as a Single Device*

The specifications of the Asserted Patents guide the definition of "controller node" by describing the controller node as a single device.  The specification first equates "controller nodes" to "Internet Control Points (ICPs)": the "CGs operate in conjunction with SPA [Service Preference Architecture]-based Internet Service Providers (ISPs) under the control of 'controller nodes,' hereinafter referred to as Internet Control Points (ICPs)." '468 Patent at 3:43-46.  When describing the ICPs, the specification states:

> As illustrated in FIG. 3, an ICP 50 may include one or more network interfaces 200, one or more processors 202, a memory device 204 including a database for storing records, and a non-internet communications link for traffic between processors and shared storage and memory. The records preferably include instructions that may be updated by active intervention system 64 and distributed to CGs 58 and SPA-controlled network elements 54 for execution.

*Id.* at 6:63-7:3. Figure 3 illustrates the "controller node" or "ICP" as a single device that may encompass one or more components (e.g., network interface 200, processor 202, and memory 204).



The asserted claims require the same "controller node" that "generates" controller instructions to "transmit" the controller instructions. For example, claim 1 of the '468 Patent requires, in relevant part:

> *a* controller node coupled to the service provider network, *the* controller node comprising:
>
>> a first processor configured to **generate controller instructions**; and
>>
>> a first network interface configured to **transmit the controller instructions** over the service provider network to a plurality of gateways. . . .

'468 Patent at Claim 1. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314. As the claim language above illustrates, the "generate" and "transmit" functions are part of "*the* controller node." Thus, the same controller node that "generates" the controller instructions must also "transmit" those instructions.

MCM explained in the Unified Patents IPR that multiple devices could not be used together as one to perform the two steps of the controller node. In that IPR, MCM argued that a "controller node" that receives instructions from a human or **another device** falls outside the scope of generating the controller instructions:

> Petitioner's proposed construction of "generate" is overly broad and would *incorrectly encompass the operation of the controller node receiving an existing controller instruction from another source* (e.g., a human administrator or *another network device)* and then transmitting the received controller instruction to the gateway unit.

Ex. A (POPR) at 13 (emphasis added). Accordingly, MCM distinguished a controller that includes multiple network devices operating in unison from the claimed "controller node." *Id.* By unequivocally arguing to the PTAB that receiving controller instructions from "another source"—including "another network device"—falls outside of the scope of generating controller instructions, MCM defined and limited the scope of the "controller node" to "a single device" performing the claimed functions and is now bound by its own narrowed construction. *See Am. Piledriving,* 637 F.3d at 1336.

DISH does not seek to limit the claims to only a single controller node. Rather, the claim language and MCM's own statements to the PTAB in IPR demonstrate that a single device must perform the "generating" and "transmitting" functions claimed for the "controller node." MCM's proposal ignores this intrinsic evidence. Without the "single" qualifier, any number of devices could be combined to "generate" the controller instructions and "transmit" the controller instructions, contrary to the concessions made by MCM in the IPR proceedings. *See Aylus*, 856 F.3d at 1363 ("statements made by a patent owner during an IPR proceeding can be considered during claim construction and relied upon to support a finding of prosecution disclaimer").

Extrinsic evidence also supports DISH's construction that "a node" is "a *single* network device." The Computer Glossary defines a "node" as "a network junction or connection point." Ex. C (The Computer Glossary: The Complete Illustrated Dictionary, (7th Edition 1995)).

2. *The Remaining Portion of DISH's Construction is Consistent with the Claims and Specification Without Importing Limitations*

Though the specification provides no details as to the structure of the "controller," the

specification demonstrates that the "controller" is a device on a network. For example, the specification states that a "Service Preference Architecture (SPA) may include at least one Internet Control Point ("ICP") 50 connected to a network 52." '468 Patent at 4:55-57. The claims also require that the controller node be "coupled to the service provider network." *Id.* at Claim 1, 23. Thus, the specification and claims support DISH's broader construction that a "controller" is more properly construed as a generic "network device."

The specification consistently discusses that a controller node "controls operation of the gateway units." For example, the specification states:

> ***ICP 50 may control CGs 58*** to determine what web site data is allowed to pass through to subscribers using, for example, web browser programs executing in subscriber terminals 60. ***ICP 50 may also control packet inspection processing in CGs 58*** to determine which data can be allowed to flow through CGs 58 to and from subscriber terminals 60, specifically when e-mail or file transfers are initiated. ***ICP 50 also controls what activities are engaged in by idle CGs 58*** when corresponding subscriber terminals 60 are inactive.

*Id.* at 5:26-35 (emphasis added).

Newton's Telecom Dictionary defines a "controller" as "***a device*** which controls the operation of another piece of equipment." Ex. D (Newton's Telecom Dictionary (15th Edition 1999) (emphasis added). This definition mirrors DISH's construction that "controller" means a "device that controls operation of the gateway units."

MCM's construction, however, imports limitations from the preferred embodiment, ignores the express teachings of the specification, and adds terms not even used in the specification. MCM's construction is contrary to established precedent and, thus, must be rejected. *See In re Gabapentin Patent Litigation*, 503 F.3d 1254, 1265 (Fed. Cir. 2007) (noting that the proper construction of the term must take into account the requirements disclosed in the specification). As to "controller," MCM imports the requirement of a "network-based router or computer located within the network" only found in one embodiment: "ICPs ***may be*** network-

based routers or computers that control the operation of the CGs." *See* '468 Patent at 3:47-48.

MCM's construction also creates an ambiguity by its use of "or" in the construction. Despite its intent, MCM's construction could be argued to suggest that the "computer located within the network and remote from the gateway unit" could serve as an alternative to the "network-based router," where the router does not have to be within the network or remote from the gateway unit. Constructions that improperly shoehorn limitations merely cause jury confusion.

### C. Term 3: "a service provider network" ('468: Claims 1 and 23 / '925: Claims 1 and 29)

| MCM's Construction | DISH's Construction |
|---|---|
| "a network that is operated or controlled by a service provider to provide regulated access to content delivery services for subscribers, but not including subscriber equipment or a subscriber network" | "a network between the controller node and the plurality of gateway units that is not the public Internet and only includes those network elements operated or controlled by the service provider" |

The parties' dispute centers on the scope of "a . . . network" that is operated or controlled by a "service provider" as required by all asserted claims. DISH's proposed construction prevents MCM from improperly capturing *all* types of networks, including the public Internet. The plain language of the specification supports DISH's proposed construction. Further, DISH's construction reinforces MCM's own public disclaimer based on arguments that ultimately resulted in the PTAB's dismissal of the Unified Patents' IPR petition.

### 1. The Limited Disclosures of the Claims and Specification Support DISH's Construction of the Scope of "A Service Provider Network"

The language of the claims supports DISH's construction that the claimed "service provider network" must be "between the controller node and the plurality of gateway units that is not the public Internet and only includes those network elements operated or controlled by the service provider." The claims of the Asserted Patents recite systems and methods "for regulating

access to a service provider network." '468 Patent at Claims 1, 23; '925 Patent at Claims 1, 29. The claims show that the service provider network is used to transmit and receive data between the controller node and the gateway units. For example, claim 1 of the '468 Patent includes "a controller node **coupled to the service provider network**" that is "configured to **transmit** [] controller instructions **over the service provider network** to a plurality of gateway units."[1] '468 Patent at claim 1 (emphasis added). The "gateway units" are configured to:

- "**receive** user-entered content **requests for the service provider network**;"

- "**receive** the controller instructions from the controller node **through the service provider network**;"

- "selectively **transmit** the content requests **to the service provider network** in accordance with the controller instructions;" and

- "**transfer** received content data responsive to the transmitted content requests **from the service provider network**."

*Id.* (emphasis added).

The full term "service provider network" does not appear in the specification of the Asserted Patents. However, the specification contemplates "a system including a Service Preference Architecture (SPA)" that establishes the bounds of the claimed service provider network. *Id.* at 3:34-37. Specifically, the Asserted Patents define the SPA as "a collection of hardware components and software routines executed by the components" including "[c]omponents installed at a subscriber's site [that] may be referred to as gateway units, or more specifically, Communication Gateways (CGs)." *Id.* at 3:37-41. With regard to the gateway units (i.e., the CGs), the specification explains that they operate under the control of the service provider network:

---

[1]     The claims of the '925 Patent are substantially similar to those of the '468 Patent. The only substantive difference is the replacement of "gateway units" as found in the independent claims of the '468 Patent with "network elements" in the '925 Patent.

> *CGs operate* in conjunction with SPA-based Internet Service Providers (ISPs) *under the control of "controller nodes,"* hereinafter *referred to as Internet Control Points (ICPs)*. The ICPs are *installed in an ISP's network*. ICPs may be network-based routers or computers that control the operation of CGs.

*Id.* at 3:43-48 (emphasis added). The controller nodes (i.e., the ICPs) control the flow of information between the CGs and the service provider network:

> In general, the *SPA uses ICPs to control subscriber access* to web sites and to deliver data to subscribers. The *ICPs control the processing of data sent between subscribers (e.g., client PCs or LAN servers) and the ISPs or content servers* with which they are exchanging information, using the CGs.

*Id.* at 3:54-58 (emphasis added).

Figure 1 of the Asserted Patents (reproduced below) illustrates the embodiment described above that refers to service providers as "internet service providers" or "ISPs."



*Id.* at Figure 1. In this embodiment, the specification acknowledges "all ICP-CG communications take place within the ISP side of the network." *Id.* at 4:33-34. Accordingly, *the Asserted Patents admit that "a service provider network" (e.g., the ISP side of the public network 52) exists that is separate and distinct from the remainder of the public network*.

The '468 Patent discloses other embodiments where "[s]ervice providers include, for example, telephone line carriers, enterprise data centers, and cable television providers." *Id.* at

1:35-37. In these embodiments, a service provider may not use the Internet at all. *See* Ex. E (Wechselberger Dec.) at ¶39. For example, a "cable service provider" may include a "side" of the network that only transmits data over traditional coaxial cable lines. *Id.* at ¶¶24-37. At the time of the alleged invention of the Asserted Patents, such "cable only" service provider networks were well understood by persons of ordinary skill in the art. *Id.* As explained below, MCM previously acknowledged this distinction between the claimed "service provider network" and the public Internet—disclaiming any broader coverage than DISH's proposed construction during prosecution and the recent IPR proceedings.

> 2. *During IPR Proceedings MCM Disclaimed Networks that Include the Public Internet*

MCM unequivocally disclaimed service provider networks disclosed in the prior art by arguing that "***the service provider network is not the entire public internet and only includes those network elements operated or controlled by the service provider***." Ex. A (POPR) at 6-7 (emphasis added). DISH's proposed construction seeks to hold MCM to those public statements regarding the scope of this term. *See Aylus*, 856 F.3d at 1361.

During prosecution of the parent '128 Patent, the Examiner rejected the pending claims as being anticipated by U.S. Patent No. 6,516,416 to Gregg *et al.* ("Gregg"). *See* Ex. F ('128 Patent File History, 10-26-09 NFOA) at 2. Specifically, the Examiner cited the following passage from Gregg as disclosing the claimed system for regulating access to a network:

> More particularly, it is an object of the present invention **to provide such an improved subscription access system that provides secure access** through either a one factor (conventional user name and password) or two factor authentication (using an optional hardware access key with a unique digital ID), thus enabling a superior and effective subscriber authentication which **only allows registered subscribers to access protected contents** and subscriber authorization which determines the subscriber's access level within a protected site.

Ex. G (Gregg) at 1:58-67 (emphasis added); Ex. F ('128 Patent File History, 10-26-09 NFOA) at

2. In response, the Applicant added the term "service provider" to the claimed "network." Ex. H ('128 Patent File History, 1-26-10 Response to NFOA) at 2. Applicant argued that the system of Gregg did not disclose the limitations of these amended claims because the alleged "controller node" and "gateway units" were separated by a local area network, not a service provider network as claimed. *Id.* at 32-33.

MCM later doubled down on this position, expanding the scope of the disclaimer for the "service provider network" term during IPR proceedings involving the '468 Patent. In MCM's POPR, it explained:

> During prosecution, Patentee **amended the claims to clarify** that the "network" recited in Claim 1 is the "service provider network" **as opposed to being any network, such as the subscriber's local area network or the entire public Internet**.

Ex. A (POPR) at 7 (emphasis added). Like Gregg, the prior art in the Unified Patents IPR—U.S. Patent No. 5,987,611 to Freund ("Freund")—involved a conditional access server that communicated with a client via a local area network behind a firewall. Ex. I (Freund) at Fig. 3A.

To distinguish the claimed system of the '468 Patent from the system disclosed by Freund, MCM provided the following annotations to Figure 1 of the '468 Patent:



Ex. A (POPR) at 6 (annotations in original). MCM argued that the service provider network did

not include third-party network elements or any network elements of the public Internet:

> Fig. 1 also illustrates that the **"service provider network" 54 is distinct from Non-SPA Network Elements 55**. Collectively, the "service provider network" and Non-SPA Network Elements comprise the Internet/Metro Area Network. Thus, the "service provider network" is not the entire public Internet and **only includes those network elements operated or controlled by the service provider**.

*Id.* (emphasis added).

Relying on these and other statements, the PTAB denied institution of the '468 Patent IPR petition. Ex. J (*Unified Patents, Inc. v. Multimedia Content Management LLC*, IPR2017-01934, Paper 10 (Institution Decision) (PTAB Mar. 5, 2018)). These statements by MCM during the IPR proceedings constitute a "clear and unambiguous disavowal of claim scope" that a service provider network does not cover any type of network. The Federal Circuit previously held that "an applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well." *See, e.g.*, *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir. 2007) (internal citations omitted). As with patent prosecution, statements made by a patent owner during IPR put the public on notice of how the patent owner views its patent. *See Aylus*, 856 F.3d at 1359. MCM cannot abandon its earlier statements to broaden the reach of its patents now that it argues for infringement by DISH. Even if not expressly adopted, the public is still entitled to rely on MCM's interpretation. *See Am. Piledriving*, 637 F.3d at 1336 (explaining that "regardless of whether the examiner agreed with" a patent owner's statements, those "statements still inform the proper construction of the term").

Accordingly, the specification and MCM's unequivocal disclaimer support the proper construction of "a service provider network" as "a network between the controller node and the plurality of gateway units that is not the public Internet and only includes those network elements operated or controlled by the service provider."

### D. Term 4: "selectively transmit[ting, by the plurality of gateway units,] the content requests to the service provider network in accordance with the controller instructions" ('468: Claims 1 and 23 / '925: Claims 1 and 29)

| MCM's Construction | DISH's Construction |
|---|---|
| "a gateway unit, under control of the remotely located controller node, executes previously received controller instructions to determine whether to transmit a content request from a user or to take other action (e.g., deny the content request, redirect the content request, or notify authorities regarding the content request)" | "transmitting all content requests to take place within the service provider network in response to the controller instructions' decision to transmit the content requests" |

The key dispute concerns whether the "content requests" must travel on the "service provider network" as shown by the plain language of the claims and the specification or whether they can be sent over network components outside of the "service provider network."

The claims require a "gateway unit" or "network element" that "selectively transmits" content requests "**to the service provider network**." However, the claims are unclear on how components, or endpoints, of the service provider network (e.g., a "gateway unit" or "network element") can transmit requests to that same service provider network. To resolve this ambiguity in the claim language, we must look first to the specification for guidance. *Phillips*, 415 F.3d at 1315 (citing *Bates v. Coe*, 98 U.S. 31, 38 (1878) ("in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims")).

The specification clarifies that communications occur using the service provider network rather than to the network. Specifically, the Summary section explains "[c]onsistent with the invention, there is provided a system for regulating access to a network." '468 Patent at 2:23-24. Then, the specification describes an embodiment that tracks the asserted system claims:

> the second processor *selectively transmitting* at least some of the network access requests *over the network* in accordance with the controller instructions, and transferring content data responsive to the transmitted network access requests

over the network via the second network interface.

*Id.* at 2:24-38 (emphasis added). As shown above, the Summary of the Invention describes the selective transmission of content requests as occurring "***over*** the service provider network" rather than "***to*** the service provider network." *Id.* (emphasis added).

When discussing the security features of the disclosed system, the specification further demonstrates that the selective transmission occurs ***within*** the service provider network. As described above, the specification refers to the controller nodes as "ICPs" and the gateway units as "CGs." *See supra at* III.C. The specification then unequivocally states "***all*** ICP-CG ***communications*** take place ***within*** the ISP side of the network." '468 Patent at 4:33-34 (emphasis added). By explaining that "all" communications take place ***within*** the service provider network, the specification supports that "content requests" also travel ***within*** the service provider network. *See The Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1305 (Fed. Cir. 2017) (explaining that claim construction requires a process described in the specification when the specification states that the "process includes all of the embodiments as described").

MCM's construction includes unnecessary and unsupported limitations would only confuse a jury. Specifically, MCM's proposed construction adds "to determine whether to transmit a content request from a user or to take other action (e.g., deny the content request, redirect the content request, or notify authorities regarding the content request)." That determination should properly occur at the "[to generate / generating] controller instructions" step construed as "to create[ing] or bring[ing] into being computer executable instructions ***that determine whether to transmit or not transmit a content request from a user to the service provider network***." *See supra at* III.A. This additional determination step is thus properly included in the construction of "controller instructions" that actually perform this "determining" function. MCM's remaining parenthetical phrase in their proposed construction includes nothing

but optional examples of the "other actions" that MCM asserts may be performed. These optional examples are not limiting and should not be included in the construction of this term. *See, e.g.*, *In re Johnston*, 435 F.3d 1381, 1384 (Fed. Cir. 2006) ("As a matter of linguistic precision, optional elements do not narrow the claim because they can always be omitted.").

The Court should thus construe this term as "transmitting all content requests to take place within the service provider network in response to the controller instructions' decision to transmit the content requests."

### E. Term 5: "gateway units" ('468: Claims 1 and 23) / "gateway nodes" ('468 Claim 27)[2]

| MCM's Construction | DISH's Construction |
|---|---|
| "a computer device that is located within a subscriber premise, remote from the controller node, that is under control of the controller node, and that is usable by a subscriber to perform certain functionality only as permitted by the controller node" | "computer devices that are remote from the controller node and interface with the service provider network and a subscriber terminal" |

The parties' dispute centers on whether or not the "gateway units" ***must*** be "located within a subscriber premise" as proposed by MCM without any intrinsic support. DISH's construes "gateway units" consistently with the specification and IPR proceeding prosecution history.

#### 1. The Claims and Specification Support DISH's Construction of "Gateway Units"

The claim language and specification confirm that "gateway units" are "computer devices that interface with the service provider network and a subscriber terminal." For example, Figure 1 of the specification depicts the "Communication Gateway" between the "Subscriber Terminal" and the network 52. '468 Patent at Figure 1; 4:54-5:3. Claim 1 of the '468 Patent states that a

---

[2]     The parties agree that "gateway nodes" and "gateway units" should be construed the same.

gateway unit has "a second network **interface coupled to the service provider network** and configured to receive the controller instructions from the controller node **through the service provider network**." '468 Patent at Claim 1 (emphasis added). Claim 23 also provides that the gateway units "selectively transmit[] . . . the content requests **to the service provider network**" and "transfer[] . . . received content data responsive to the transmitted content requests **from the service provider network**." '468 Patent at Claim 23 (emphasis added). Thus, the claims require that the gateway units "interface with the service provider network." The specification further provides that "**[a] subscriber terminal $60_1$, $60_2$, . . . $60_n$ may be connected to each respective CG 58**, or in an alternative embodiment not shown, may be combined with each respective CG 58 to form 'converged' CGs 58." In either embodiment, the gateway unit "interfaces with the subscriber terminal" in addition to the service provider network as required by the claims.

Extrinsic evidence likewise supports DISH's construction. Microsoft defines "gateway" as "a device that connects networks using different communications protocols so that information can be passed from one to the other." Ex. L (Microsoft Press Computer Dictionary (3rd Edition 1997)). That definition is consistent with the specification, where the "gateway units" connect the service provider network and subscriber terminal to pass information—the content requests—from one another.

       2.     *MCM's Construction Improperly Imports Example Embodiments from the Specification Into its Proposed Construction*

MCM's inclusion of the narrowing limitation "located within a subscriber premise" is both superfluous and unsupported. The parties agree that the construction of "gateway units" include being located "remote from the controller node." However, MCM's construction limiting the specific location of the "gateway units" as "within a subscriber premise" goes too far. The specification describes a gateway unit at a subscriber's site as one embodiment:

"[c]omponents installed at a subscriber's site *may be* referred to as gateway units, or more specifically Communication Gateways (CGs)." '468 Patent at 3:37-40. MCM imports that embodiment into its proposed construction. *See Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). MCM's further reliance on the specification describing that "[a] subscriber terminal $60_1$, $60_2$, . . . $60_n$ may be connected to each respective CG 58, or in an alternative embodiment not shown, may be combined with each respective CG 58 to form 'converged' CGs 58" is also misplaced. '468 Patent at 4:67-5:3. This portion of the specification only provides an embodiment where a gateway unit is combined with a subscriber terminal. The specification does not establish that the "converged" system is located within a subscriber premises.

MCM's construction is also nonsensical when applied to the allegedly infringing products. Under MCM's construction, a device could hypothetically infringe when inside a home (i.e. subscriber premises) but no longer infringe once it is taken outside the home. *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1383 (Fed. Cir. 2011) ("It is not inappropriate for a court to consider the accused devices when construing claim terms, for the purpose of 'claim construction' is to resolve issues of infringement.").

MCM's reliance on the specification and the prior IPR proceedings focuses on the "anti-tampering aspect" of the housing of the gateway units, e.g., "[t]he CGs cannot be tampered with by subscribers." '468 Patent at 3:62-4:10. In its POPR, MCM construed "gateway unit" to "exclude a device in which the subscriber (e.g., an end user) has access to the device's hardware and software." Ex. A (POPR) at 11-12. However, nothing in the specification or the POPR explicitly limited the "gateway units" to the subscriber premises. While the specification

discusses that a "gateway unit" may be "tamper-proof," that discussion never requires that the "gateway unit'" be located in a subscriber premise. *See, e.g.*, '468 Patent at 3:62-4:32. MCM cannot rewrite the claims to retroactively import the limitation from the specification.

F.    Term 6: "network elements" ('925: Claims 1 and 29)

| MCM's Construction | DISH's Construction |
|---|---|
| "a computer device that is located remote from the controller node, that is under control of the controller node, and that is usable by a subscriber to perform certain functionality only as permitted by the controller node" | "computer devices within the service provider network" |

The parties' dispute centers on whether the claimed "network elements" of the '925 Patent are different from the "gateway units" found in the dependent claims of the '925 Patent and the claims of the '468 Patent. MCM's proposed construction improperly combines these two distinct claim terms. DISH's construction gives meaning to these distinct claim limitations.

MCM proposes the same construction for the "network elements" term and the "gateway units" term. *See supra at* III.D. The "gateway units" term repeatedly appears in the dependent claims of the '925 Patent. *See, e.g.*, '925 Patent at Claim 13, 14, 21, 34, 40, 41. It is improper to read into an independent claim a limitation explicitly set forth in another claim as MCM proposes to do. *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings.).

MCM's construction results in a nonsensical interpretation of claim 24. As discussed above, the specification refers to "gateway units" as "communication gateways" or "CGs." Dependent claim 24 of the '925 Patent explains the relationship between "network elements" and communication gateways:

> 24.    The system of claim 1 wherein the controller instructions include controller instructions to be distributed to a plurality of ***communication gateways***

via the plurality of ***network elements***.

*Id.* at Claim 24 (emphasis added). Adding MCM's construction results in claim 24 stating:

> 24. The system of claim 1 wherein the controller instructions include controller instructions to be distributed to a plurality of ***computer device[s] that [are] located remote from the controller node, that [are] under control of the controller node, and that [are] usable by a subscriber to perform certain functionality only as permitted by the controller node*** via the plurality of ***computer device[s] that [are] located remote from the controller node, that [are] under control of the controller node, and that [are] usable by a subscriber to perform certain functionality only as permitted by the controller node***.

Adopting MCM's proposed construction renders claim 24 indefinite.

In contrast, the specification supports DISH's broader construction of the "network elements" term. The specification demonstrates that network elements are nothing more than computer devices that are used within the service provider network. For example, the specification explains "[n]etwork elements 54, 55 may include, for example, network switches and routers. SPA-controlled network elements 54 aid in regulating access and distributing content through network 52." '925 Patent at 5:11-14. Similarly, the specification states "SPA-controlled network elements 54 may include one or more network interfaces 300, one or more processors 302, a memory device 304 including a database, and one or more switch modules 306 for providing routing and switching services." *Id.* at 7:27-31. As discussed above, the "SPA-controlled network elements" are those that are operated or controlled by the service provider network. *See supra at* III.C. Accordingly, the specification tracks DISH's proposed construction of "network elements" as encompassing broad categories of computer devices.

## IV.    CONSTRUCTION OF DEPENDENT CLAIM TERMS

MCM requests construction of eight dependent claim terms without identifying any reason for construing the terms. MCM's suggested constructions depart from the plain and ordinary meaning of these terms without any prosecution history, disclaimer, or lexicography to

suggest that the original patentee intended some specialized meaning. Instead of accepting the plain and ordinary meaning, MCM attempts to rewrite the dependent claims based on a strained reading of non-limiting examples in the specification that often conflicts with the plain claim language.

Given that MCM's constructions do not appear to reflect the ordinary meaning, the real purpose of those limitations becomes apparent. MCM attempts to save dependent claims from being rendered abstract with specialized concepts and limitations not originally found within those claim limitations. MCM cannot preserve the validity of these claims by rewriting them now. A construction that adds language to a claim without intrinsic support, but rather in response to a validity concern, is impermissible. *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374 (Fed. Cir. 2014) ("Where the meaning of a claim term is clear, as it is here, we do not rewrite the claim to preserve its validity."). The Federal Circuit cautions against such redrafting of terms. *Id.* ("Courts should be cautious not to allow claim construction to morph into a mini-trial on validity. Claim terms should be given their plain and ordinary meaning to one of skill in the art at the relevant time and cannot be rewritten by the courts to save their validity."). Given that MCM cites no authority to suggest that dependent claim limitations can be rewritten to change or narrow the plain and ordinary meaning in this fashion, MCM's constructions should be rejected in favor of the plain and ordinary meaning for those terms. Plainly stated, a party cannot take an abstract, conventional, or general claim term and import limitations to make it non-conventional in order to save that claim from invalidity.

### A. Term 1: "if the gateway unit enters the inactive state" ('468: Claim 29)

| MCM's Construction | DISH's Construction |
|---|---|
| "within a reasonable time before or after the gateway unit enters the inactive state" | Plain and ordinary meaning |

Read in context, the claim phrase states "a gateway unit notifying the controller node *if*

*the gateway unit enters the inactive state*." '468 Patent at Claim 29. The jurors will understand the plain and ordinary meaning of this phrase. Nonetheless, MCM proposes a new temporal requirement of "within a reasonable time before or after," appearing to construe the "*if*" within the claim term. Dkt. No. 39 at A-5. MCM's temporal requirement rewrites the dependent claim from its originally intended meaning into a completely different claim with different scope. No intrinsic support exists for MCM's proposal.

The specification explains the functions for an active or inactive gateway unit (identified as a "CG" or "Communication Gateway"):

> Active CGs 58 may process and control delivery of content and services from SPA-controlled content server 56 or ISP portal 62. Inactive CGs 58 may process and control either CG maintenance or may carry out activity delegated to inactive CGs by design.

'468 Patent at 7:48-52. The specification further explains the interaction between a controller node and a gateway unit in an active or inactive state to prevent denial of service and spoofing attacks:

> Network units, including, for example, powered up and inactive CGs 58 and SPA-controlled network elements 54, may be directed by instructions received from an ICP 50 to initiate repeated requests for service or other similar transactions to URLs or IP addresses of "pirate" sites, that is, sites that have been identified for interdiction in an ICP-delivered conditional denial of service list. . . .

> A powered-up inactive CG 58 may, under ICP 50 control, inspect the computer file system associated with any subscriber terminal 60 available to it on the network to which CG 58 is attached.

'468 Patent at 10:7-11; 11:10-13; *see also id. at* 10:59-63.

The specification does not interject a temporal limitation for the gateway unit notifying the controller node when it enters the inactive state. MCM provides no guidance on the scope of what constitutes a reasonable time *before* or *after*. Despite suggesting that a compromise may be reached at the meet and confer by clarifying MCM's construction, the only follow-up that DISH

received is that MCM intends to stick to its original proposal. Ex. K (Email from Ben Johson).

Moreover, the addition that a notification somehow can go a "reasonable time" *after* conflicts with the purposes of tamper-proofing the network as described in the specification. As the patent explains, "all ICP-CG communications take place within the ISP side of the network and ICP-CG communications are secured with encryption hashing" to address tamper-proof concerns. '468 Patent at 4:33-36. In fact, the specification describes that upon "transition from an inactive to an active state, the CG signals the ICP and the ICP returns an 'OK' message prior to proceeding further" to "secure control of the data flow" and "to effectively and efficiently control the services provided to subscribers." '468 Patent at 4:39-48. MCM's proposal that a notification can come after some undefined "reasonable" amount of time compromises this security described in the patent specification. MCM's proposal still allows communication to come and go to a CG that has gone inactive but has yet to notify the ICP of this change.

Finally, the specification references a "notification" in connection with inactivity by stating that the notification can be used to trigger entering the inactive state:

> Upon power down or inactivity timeout of CG 58, CG 58 may register itself as "idle" by sending an event notification to ICP 50. The duration of an inactivity timeout may be preset and may be changed by input to ICP 50 for distribution to all CGs 58 under the control of ICP 50.

'468 Patent at 7:35-39. Rather than suggesting a "temporal" time constraint for the notification, the specification discloses that the notification itself can be a trigger for going to the inactive state. If the Applicant had wished the claims to include some sort of "temporal" limitation, it could have expressly included such a limitation. The Applicant chose not to.

### B. Term 2: "registration information" ('468: Claim 33)

| MCM's Construction | DISH's Construction |
|---|---|
| "information that associates a gateway unit with a controller node" | Plain and ordinary meaning |

Both "registration" and "information" can be easily understood by a jury. For example, claim 33 of the '468 Patent recites a gateway unit "receiving registration information from a user" and "transmitting the registration information to the controller node." It does not require that the "registration information" somehow "associates" the "gateway unit" with a "controller node." The specification similarly describes the registration process as passing information: "CGs 58 will remain inactive until they receive a registration confirmation from SPA-controlled content server 56 or ICP 50. The registration process may include collection of information by ICP 50 for a warranty registration from the subscriber. . . ." '468 Patent at 7:20-25. Another example in the specification suggests an association between the ISP and the gateway unit, not the controller node as MCM proposes in its construction: "The first entry is permanent and allows for initial registration and download of ICP addresses for the *ISP associated with the specific CG*, network element, or SPA-controlled content server." '468 Patent at 15:14-19 (emphasis added).

MCM's requirement that an "association" somehow exists also contradicts the plain and ordinary understanding of registration, defined simply as: "the address registration function is the mechanism by which Clients provide address information to the LAN Emulation Server." Ex. D (Newton's Telecom Dictionary 15th edition 1999) at 691.

Finally, claims 40 and 41 of the '925 Patent demonstrate that the Applicant knew how to claim an association: claim 40 "user display associated with a gateway unit;" claim 41 "display unit associated with a gateway unit." Applicant chose not to limit claim 33 in this manner.

### C. Term 3: "uniquely" ('468: Claim 24)

| MCM's Construction | DISH's Construction |
|---|---|
| "possessing, within a network, a characteristic of a device that is not shared by other devices within the network" | Plain and ordinary meaning |

The specification uses "unique" several times as that term is plainly understood. For example, in the discussion regarding the "master database" at the ICP, the specification discusses records such as "unique identifiers of CG." '468 Patent at 14:51-57. Another portion of the specification uses "unique" to describe a unique identifier or "unique identifying information about which CG 58 holds which portion of content." '468 Patent at 13:39-42. MCM provides no indication that the specification intended to depart from the plain and ordinary meaning of "uniquely." Claim 24 uses "uniquely" for identification: "wherein each of the gateway units has an identifier that *uniquely* identifies the gateway unit." '468 Patent at Claim 24 (emphasis added).

MCM nonetheless proposes to define "uniquely" as "possessing . . . a characteristic of a device that is not shared by other devices within the network." This construction is impermissible because the '468 Patent uses "uniquely" consistently as identifying information. Expanding the claim limitation to cover "characteristics" and rewriting the claim in this manner is not warranted. MCM has shown no reason to depart from the plain and ordinary meaning of this term.

**D. Term 4: "initial operating parameters" ('468: Claim 33)**

| MCM's Construction | DISH's Construction |
|---|---|
| "one or more variables associated with an operating mode first entered into by a gateway unit after registration" | Plain and ordinary meaning |

No support exists for reinterpreting "initial operating parameters" in the manner proposed by MCM. Indeed, the claim itself suggests the plural "parameter*s*," yet MCM uses "***one*** or more" in its proposed construction. As shown above, MCM knew how to claim an "association" when required to do so in the claims. Furthermore, the addition of "first entered into" and "after registration" suggest more temporal restrictions that are unnecessary and misleading to a jury.

MCM's construction suggests that the claim term requires some specific type of initial operating parameter with some undefined "association" between the "variables" and the "operating mode first entered into by a gateway unit after registration." No intrinsic evidence suggests such a construction. The Court should thus adopt the plain and ordinary meaning for this term.

### E. Term 5: "subscriber management system" ('925: Claim 25)

| MCM's Construction | DISH's Construction |
|---|---|
| "a system that manages subscriber devices of a service provider network, the subscriber management system being part of the service provider network" | Plain and ordinary meaning |

Nothing in the claims or the specification suggests that the Applicant intended for the meaning of "subscriber management system" to depart from its plain and ordinary meaning. The beginning of MCM's proposed construction simply reorders the claim language itself by requiring "a system that manages subscriber[s]" instead of a "subscriber management system." The claim language does not support including references to the "service provider network." The specification only describes "a subscriber management system used to control access to the network" without further explanation of the network under control. MCM cannot justify why this Court should depart from the plain and ordinary meaning that a jury would readily understand.

### F. Term 6: "authenticate subscribers or devices before allowing access into the service provider network" ('925: Claim 25)

| MCM's Construction | DISH's Construction |
|---|---|
| "identifying subscribers or devices that are allowed to access a requested service provided by the service provider network" | Plain and ordinary meaning |

MCM's proposed construction does not simplify the claim language. Essentially, MCM's proposed construction seeks to replace "authenticate" with "identify[]" and interject "a requested service" into the claim. No support for either of these changes exists in the intrinsic

record.

The specification repeatedly refers to subscriber access by using the terms "authenticate" and "authentication." *See, e.g.*, '468 Patent at 9:59-61 ("The authorization instructions must be received by access node 66 before the subscriber may be authenticated and granted internet access."); 4:1-4 ("Updates to this code are obtained from ICPs and encrypted passwords are stored in hidden, undocumented locations to allow authentication of ICP presence prior to CG control program update."). Accordingly, the specification uses "authenticate" as understood by its plain meaning. Replacing "authenticate" with "identifying" does not clarify the scope of the claims.

Further, the phrase "requested service" does not appear in the specification. As *Phillips* instructs, importation of terms from the specification should be avoided. *See Phillips*, 415 F.3d at 1323. This Court should avoid importing terms that are not found in the specification at all.

### G. Term 7: "further enable the gateway units to receive additional software" ('468: Claim 15)[3]

| Agreed Construction |
|---|
| Plain and ordinary meaning |

### H. Term 8: "user-controlled operational mode" ('468: Claim 30 / '925: Claim 36)

| Agreed Construction |
|---|
| Plain and ordinary meaning |

## V.  CONCLUSION

For these reasons, DISH respectfully requests the Court construe the disputed claim terms in accordance with DISH's proposed constructions.

---

[3]     On March 15, 2019, counsel for MCM informed DISH that MCM no longer intends to advance its proposed constructions for Terms 7 and 8 (Section IV.G and H). As such, those terms should have their plain and ordinary meaning.

Dated: March 15, 2019

Respectfully submitted,

/s/ Ali Dhanani
G. Hopkins Guy, III (*pro hac vice*)
BAKER BOTTS L.L.P.
1001 Page Mill Road,
Building One, Suite 200
Palo Alto, CA 94304
Tel.: (650) 739-7500
Fax: (650) 739-7699
hop.guy@bakerbotts.com

Ali Dhanani (*pro hac vice*)
Texas State Bar No. 24055400
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, TX 77002
Tel.: (713) 229-1108
Fax: (713) 229-2808
ali.dhanani@bakerbotts.com

Kurt Pankratz (*pro hac vice*)
Texas State Bar No. 24013291
BAKER BOTTS L.L.P.
2001 Ross Ave., Suite 900
Dallas, TX 75201
Tel.: (214) 953-6584
Fax: (214) 661-4584
kurt.pankratz@bakerbotts.com

John P. Palmer
State Bar No. 15430600
NAMAN, HOWELL, SMITH & LEE,
PLLC
400 Austin Ave., Suite 800
P.O. Box 1470
Waco, Texas 76703
Tel: (254) 755-4100
Fax: (254) 754-6331
palmer@namanhowell.com

**Attorneys for Defendant DISH Network
L.L.C.**

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via electronic mail on March 15, 2019.

/s/ Ali Dhanani