**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| MULTIMEDIA CONTENT | § | |
| MANAGEMENT LLC, | § | Civil Action No.: 6:18-cv-00207-ADA |
|     Plaintiff | § | |
| | § | JURY TRIAL DEMANDED |
| v. | § | |
| | § | PATENT CASE |
| DISH NETWORK L.L.C., | § | |
|     Defendant. | § | |
| | § | |

## PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

In accordance with the Court's Initial Scheduling Order, Plaintiff Multimedia Content Management LLC ("Plaintiff" or "MCM") submits the following brief in support of MCM's claim constructions submitted to the Court as part of the Joint Claim Construction Statement ("JCCS"), D.I. 39.

Contents

I. Introduction ................................................................................................................. 5

II. Patents-in-Suit ............................................................................................................ 5

III. Technology Background ............................................................................................. 6

IV. Legal Standard ........................................................................................................... 7

V. Disputed Terms of the '468 Patent ............................................................................ 8

    A. Disputed Term No. 1 – "to generate controller instructions" ............................... 8

    B. Disputed Term No. 2 – "a controller node" ........................................................ 12

    C. Disputed Term No. 3 – "a service provider network" ....................................... 14

    D. Disputed Term No. 4 – "selectively transmit[ting, by the plurality of gateway units,] the content requests to the service provider network in accordance with the controller instructions" ...................................................................................................... 17

    E. Disputed Term No. 5 – "gateway units" ............................................................. 20

    F. Disputed Term No. 6 – "gateway nodes" ........................................................... 23

    G. Disputed Term No. 7 – "if the gateway unit enters the inactive state" .............. 25

    H. Disputed Term No. 8 – "registration information" ............................................ 26

    I. Disputed Term No. 9 – "uniquely" ..................................................................... 26

    J. Disputed Term No. 13 – "initial operating parameters" ..................................... 27

VI. Disputed Terms of the '925 Patent ........................................................................... 27

    A. Disputed Term No. 5 – "network elements" ....................................................... 27

    B. Disputed Term No. 8 – "subscriber management system" .................................. 29

    C. Disputed Term No. 9 – "authenticate subscribers or devices before allowing access into the service provider network" ..................................................................................... 30

Table of Authorities

*Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019) ................................ 14, 16

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050 (Fed. Cir. 1989) ...................... 11, 13, 16

*J.G. Peta, Inc. v. Club Protector, Inc.*, 65 F. App'x 724 (Fed. Cir. 2003) .................................... 8

*Koepnick Med. & Educ. Research Found., L.L.C. v. Alcon Labs., Inc.*, 162 F. App'x 967 (Fed.
    Cir. 2005) ............................................................................................................................ 8

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S.
    370 (1996) .......................................................................................................................... 7

*Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005)................................... 20

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) .................................... 7, 8, 12

*Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396 (Fed. Cir. 2004)............................ 19

*Ushijima v. Samsung Elecs. Co.*, 2014 WL 4825373 (W.D. Tex. Jan. 6, 2014) ........................... 7

Exhibit List

| Exhibit No. | Description |
| --- | --- |
| 2001 | Declaration of Mr. Joel R. Williams |
| 2002 | File History of U.S. Patent Application No. 13/369,174 |
| 2003 | Decision Denying Institution of *Inter Partes* Review, IPR2017-01934, Paper No. 10 |
| 2004 | U.S. Patent No. 8,799,468 |
| 2005 | U.S. Patent No. 9,465,925 |

## I.   INTRODUCTION

Plaintiff Multimedia Content Management LLC ("Plaintiff" or "MCM") submits the following brief in support of MCM's claim constructions submitted to the Court as part of the Joint Claim Construction Statement ("JCCS"), D.I. 39. As detailed below, MCM's proposed constructions are supported by, and consistent with, the specifications and file histories of the patents-in-suit. In accordance with the Court's Scheduling Order, D.I. 33 (Jan. 4, 2019), and the parties' Joint Stipulation Regarding Proposed Amended Scheduling Order, D.I. 42 (March 12, 2019), the parties have not exchanged any extrinsic evidence regarding claim construction and no discovery has taken place. MCM does not believe any extrinsic evidence is necessary for the Court to properly construe the disputed terms, and therefore MCM has not cited to any extrinsic evidence in support of its proposed constructions. Should Defendant Dish Network L.L.C. ("Defendant" or "Dish") cite to any extrinsic evidence in its opening claim construction brief, Plaintiff reserves the right to continue to object to entry of such extrinsic evidence or, in the alternative, to offer additional extrinsic evidence in rebuttal as well as to cross-examine any testimonial extrinsic evidence.

## II.   PATENTS-IN-SUIT

Plaintiff asserts Dish infringes two duly and legally issued United States Patents: U.S. Pat. No. 8,799,468 ("the '468 Patent") and U.S. Pat. No. 9,465,925 ("the '925 Patent"). The '468 Patent is entitled "System for Regulating Access to and Distributing Content in a Network," and issued to Robert M. Burke II and David Z. Carman on August 5, 2014. The '468 Patent claims priority from United States Patent Application No. 10/989,023 (now U.S. Pat. No. 8,122,128), and claims priority to U.S. Provisional Pat. App. No. 60/523,057, filed on November 18, 2003. A true and correct copy of the '468 Patent is attached hereto as EX2004. The '925 Patent is entitled "System

for Regulating Access to and Distributing Content in a Network," and issued to Robert M. Burke II and David Z. Carman on October 11, 2016. The '925 Patent claims priority to U.S. Pat. App. No. 13/369,174 (now the '468 Patent), and claims priority to U.S. Provisional Pat. App. No. 60/523,057, filed on November 18, 2003. A true and correct copy of the '925 Patent is attached hereto as EX2005. Collectively, the '468 Patent and the '925 Patent are referred to as "the Patents" or "the Patents-in-suit."

On August 11, 2017, Unified Patents Inc. filed a 105-page Petition (with fourteen exhibits) before the United States Patent Trial and Appeal Board ("PTAB") pursuant to 35 U.S.C. §§311–319 seeking to institute an inter partes review ("IPR") of Claims 1–5, 9, 11–13, 19, 23–27, and 32–34 of the '468 Patent. Unified Patents argued that the claims were obvious and therefore invalid under 35 USC §103. Applying the standard set forth in 35 U.S.C. § 314(a), which requires that Petitioner demonstrate a reasonable likelihood that it would prevail with respect to at least one challenged claim, the Board denied the Petition. *See* IPR2017-01934 (referred to herein as the "IPR"), Institution Decision, Paper 10 (March 5, 2018), attached hereto as EX2003.

## III.   TECHNOLOGY BACKGROUND

The Patents describe systems and methods for managing and regulating access from a local subscriber site to content available for distribution from a remote service provider network. *E.g.*, '468 Patent, Abstract. [1] The subscriber site includes one or more subscriber terminals and communications gateways ("CGs"). '468 Patent, 3:37–40. The system further includes Internet Control Points ("ICPs") (located remote from the subscriber site), which generate and issue instructions to the CGs. *E.g.*, '468 Patent, 3:46–48; 5:25–29. These instructions control the

---

[1] Although citations in this section are to the '468 Patent, the specifications of the '468 Patent and the '925 Patent are substantively identical.

operation of the CGs. The Patents identify several control operations and associated controller instructions that the ICPs may send to the CGs (e.g., "Active and Inactive CG Processing Control," "Conditional Denial," and "Packet Inspection," etc.). '468 Patent, 7:34–8:32. By having the ICP remote from the CG in conjunction with the CG being tamperproof by the user and under the exclusive control of the ICP, the systems and methods of the Patents regulate access by the subscriber to content available from the subscriber network in a secure manner. The claimed systems allow a service provider network to protect the digital rights associated with the content and prevent a user from unauthorized alteration of the operation of the CG, which is under the control of the remote ICP. *See* '468 Patent, 4:46–48.

## IV.   LEGAL STANDARD

The Court is familiar with the legal standards for claim construction. *E.g., Ushijima v. Samsung Elecs. Co.*, No. A-12-CV-318-LY, 2014 WL 4825373, at *1–2 (W.D. Tex. Jan. 6, 2014). Determining the proper meaning of patent claims is a question of law that exclusively belongs to the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).

The words of patent claims are generally accorded with their "ordinary and customary meaning," which is the "meaning that term would have to a person of ordinary skill in the art in question at the time of invention." *Id.* at 1312–13. "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313.

Among the hierarchy of evidentiary sources relied upon for claim interpretation, the specification is the "single best guide" to the meaning of a disputed term other than the claims themselves and is usually dispositive of the analysis. *Id.* at 1315. The file history is also relevant. However, "it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1317. "Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words and have been used both by [the Federal Circuit] and the Supreme Court in claim interpretation." *Id.* at 1322. *See also Koepnick Med. & Educ. Research Found., L.L.C. v. Alcon Labs., Inc.*, 162 F. App'x 967, 972 (Fed. Cir. 2005) ("[I]t was not necessary to consider extrinsic evidence, such as expert testimony, inventor testimony, and technical treatises and articles."); *J.G. Peta, Inc. v. Club Protector, Inc.*, 65 F. App'x 724, 727 (Fed. Cir. 2003) ("Extrinsic evidence was unnecessary, and the district court did not err in declining to conduct a hearing to consider it.").

## V. DISPUTED TERMS OF THE '468 PATENT

The disputed terms for the '468 Patent are presented with the same numbering as in the JCCS, Docket 39. The Parties have proposed these terms for construction.

### A. Disputed Term No. 1[2] – "to generate controller instructions"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| "generate computer processor-executable instructions, excluding merely a uniform resource locator (URL) or an internet protocol (IP) address" | "to create[ing] or bring[ing] into being computer executable instructions that determine whether to transmit or not transmit a content request from a user to the service provider network" |

---

[2] The number of disputed terms is made in reference to the numbering used in the appendices to the JCCS. Since filing the JCCS, the parties have decided to proffer the same claim construction (e.g., Disputed Term No. 10 of the '468 Patent) for some claims listed as "disputed" in the JCCS. As a result, MCM has not addressed those terms herein.

Plaintiff's proposed construction is supported by, and consistent with, the specification of the '468 Patent. For example, Figure 1 of the '468 Patent, reproduced below, illustrates the relationships between "Internet Control Point 50" (i.e., a controller node, discussed in detail in § V.2 *infra*), "Communication Gateways 58" (i.e., a gateway unit, discussed in detail in § V.5 *infra*) and "SPA-controlled network elements 54" (i.e., a network element, discussed in detail in § VI.5 *infra*). The '468 Patent states: "ICP 50 works in conjunction with CGs 58 and SPA-controlled network elements 54 by ***generating instructions*** which are transmitted over network 52 to CGs 58 and SPA-controlled network elements 54, ***where the instructions are executed***." '468 Patent, 5:19–23 (emphasis added).



Figure 1

'468 Patent, FIG. 1.

The controller instructions, executed at the gateway unit, perform a variety of operations. *E.g.*, '468 Patent, 7:34–8:18, 11:22–43 (describing multiple examples of controller instructions that are performed by the gateway units (e.g., the "Active and Inactive CG Processing Control," the "Conditional Denial," and the "First Portal" operations)).

Further, the file history of the '468 Patent supports Plaintiff's construction, For example, during the *Inter Partes* Review ("IPR") of the '468 Patent, *Unified Patents, Inc. v. Multimedia*

*Content Management LLC*, IPR2017-01934 (PTAB Dec. 14, 2017), Mr. Joel R. Williams, an expert testifying on behalf of MCM, noted that one of ordinary skill in the art would understand a "controller instruction" to exclude merely a uniform resource locator ("URL") or an internet protocol ("IP") address. Decl. of Joel William filed in IPR2017-01934, attached hereto as EX2001, at ¶¶ 58–69. In the art of computer networks, an instruction describes a command to be performed. A URL is a computer address for a network resource, such as a web page, and an IP address is an address for a device on a TCP/IP network. An address, either in URL or IP form, is not a command and does not describe an operation to be performed. Therefore, a URL or IP address cannot be a "controller instruction" that describes an operation to be performed by the gateway unit. EX2001, ¶ 60.

In the IPR, Mr. Williams described controller instructions as follows: "While several of these controller instructions require a URL or IP address, the URLs and IP addresses are only parameters for the instructions—the URLs and IP addresses alone are not controller instructions." EX2001, ¶ 62. "For example, with respect to the 'Conditional Denial' operation, a gateway unit receives a controller instruction commanding the gateway unit to *substitute* a requested 'pirate' URL address with another URL address." *Id.* at ¶ 63; *see also id.* at ¶ 64 (quoting '468 Patent, 8:3–6). In order to carry out the "Conditional Denial" instruction, "the gateway unit is informed of a first URL (or IP address), the second URL (or IP address), and the operation to be performed (i.e., substitute the second URL for the first URL). In this example, the operation, or instruction, being performed is a *substitution*." *Id.* at ¶ 64. According to Mr. Williams, the "parameters to the instruction are the first and second URLs. While this controller instruction requires URLs (or IP Addresses) as parameters, the URLs (or IP addresses) do not describe the operation to be

performed." *Id.* Mr. Williams's conclusion was that "*the '468 Patent does not describe standalone URL or IP address parameter[s] as being a controller instruction.*" *Id.* (emphasis added).

Therefore, in view of the specification of the '468 Patent and the file history (in particular, Mr. Williams's testimony in the IPR cited above), Plaintiff submits that the proper construction of "controller instructions" is "computer processor-executable instructions, excluding merely a uniform resource locator (URL) or an internet protocol (IP) address."

Defendant's proposed construction improperly imports a limitations from the specification into the claim, namely the limitation to "determine whether to transmit or not transmit a content request." JCCS, Ex. A-1. *See Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989) ("[L]imitations appearing in the specification will not be read into claims, and that interpreting what is meant by a word in a claim 'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.'").

Defendant's construction is inconsistent with the specification of the '468 Patent. For example, as noted above, the '468 Patent describes multiple examples of operations performed by gateway units that execute the controller instructions. '468 Patent, 7:34–8:18, 11:22–43. One such example operation, entitled "Active and Inactive CG Processing Control," is used by a communication gateway to "register itself as 'idle' by sending an event notification to ICP 50." *Id.* at 7:34–37. "Inactive CGs 58 may ***process and control either CG maintenance*** or may carry out activity delegated to inactive CGs by design." *Id.* at 50–52 (emphasis added). There is nothing in the specification of the '468 Patent to suggest that the operation of processing and controlling communication gateway maintenance is the same as or related to determining "whether to transmit or not transmit a content request," as Defendant's construction would require. Thus, Defendant's attempt to improperly limit the claims of the '468 Patent to require the single operation of

determining "whether to transmit or not transmit a content request" is not supported by the '468 Patent specification and is improper. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (warning against confining claims to specific embodiments).

In addition, Defendant's construction would require the Court to construe "generate" as "create or bring into being." JCCS, Ex. A-1. This additional limitation finds no support in the specification of the '468 Patent and is inconsistent with the understanding of one of ordinary skill in the art as disclosed in the file history. In particular, in the IPR, Mr. Williams testified that one of ordinary skill in the art would understand the meaning of "generate," in the context of the claims of the '468 Patent, to exclude operations in which the controller instructions are only transmitted or are relayed (i.e., received and then transmitted) by a device. EX2001, ¶¶ 74–83; *see also id.* at ¶¶ 78–80 (finding the notion that the generated item did not exist prior to being generated consistent with the understanding of one of ordinary skill in the art). Accordingly, a person of ordinary skill in the art would understand the meaning of "generate" to exclude operations in which the controller instructions are only transmitted or relayed by a device (i.e., brought "into being").

Based on the above evidence, the proper construction of "generate controller instructions" based on the '468 Patent in its entirety, the file history, as well as the understanding of one of ordinary skill in the art, is Plaintiff's proposed construction: "generate computer processor-executable instructions, excluding merely a URL or IPR address." JCCS, Ex. A-1.

## B. Disputed Term No. 2 – "a controller node"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| "A network-based router or computer located within the network and remote from the gateway unit and that controls the operation of one or more gateway units" | "a single network device that controls the operation of the gateway units" |

12

Plaintiff's proposed construction is supported by, and consistent with, the specification of the '468 Patent. For example, the '468 Patent states: "CGs operate in conjunction with SPA-based Internet Service Providers (ISPs) under the control of "controller nodes," hereinafter referred to as Internet Control Points (ICPs). The ICPs are **installed in an ISP's network**. ICPs may be **network-based routers or computers that control the operation of CGs**." '468 Patent, 3:43–47 (emphasis added). Therefore, in view of the specification of the '468 Patent, Plaintiff proposes to construe "controller node" as a "network-based router or computer located within the network and remote from the gateway unit and that controls the operation of one or more gateway units."

Figure 1 of the '468 Patent, reproduced below, illustrates the relationships between "Internet Control Point 50" (i.e., a "controller node"), "Communication Gateways 58" (i.e., a gateway unit, discussed in detail in § V.E *infra*) and "SPA-controlled network elements 54" (i.e., a network element, discussed in detail in § VI.E *infra*).



Figure 1

'468 Patent, FIG. 1. As illustrated in Figure 1, the Internet Control Point 50 (i.e., a controller node) is located remote from communication gateway 58 (i.e., a gateway unit).

Defendant's proposed construction improperly adds an extraneous limitation, i.e., "a ***single*** network device." JCCS, Ex. A-2 (emphasis added). *See Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989) ("[L]imitations appearing in the specification will not be read into claims, and that interpreting what is meant by a word in a claim 'is not to be confused

13

with adding an extraneous limitation appearing in the specification, which is improper.'"); *see also Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019) (cautioning against "improperly importing limitations into the claims."). Specifically, Defendant's construction seeks to limit "a controller node" to "a **single** network device." There is no support in the '468 Patent for this position. In fact, the '468 Patent explicitly contradicts Defendant's construction: "The **ICPs** are installed in an ISP's network. ICPs may be **network-based routers or computers** that control the operation of CGs." '468 Patent, 3:43–47 (emphasis added). Every term in this portion of the '468 Patent is **plural**. The '468 Patent expressly considers **multiple** "network-based routers or computers." *Id.*

Thus, the proper construction of "controller node," based on the '468 Patent in its entirety, is Plaintiff's proposed construction: "A network-based router or computer located within the network and remote from the gateway unit and that controls the operation of one or more gateway units." JCCS, Ex. A-2.

## C.  Disputed Term No. 3 – "a service provider network"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| "a network that is operated or controlled by a service provider to provide regulated access to content delivery services for subscribers, but not including subscriber equipment or a subscriber network" | "a network between the controller node and the plurality of gateway units that is not the public Internet and only includes those network elements operated or controlled by the service provider" |

Plaintiff's proposed construction is supported by, and consistent with, the specification of the '468 Patent. For example, the '468 Patent relates "to regulation of access to a [service provider] network . . . to distribut[e] content efficiently while protecting the digital rights associated with the content." '468 Patent, 1:17–20. The '468 Patent describes a "service provider network" that is operated or controlled by a service provider, such as a cable television provider. '468 Patent, 1:35–38. The service provider delivers content to subscriber terminals, which are located at a

subscriber's premises. '468 Patent, 1:38–39. The subscriber's premises may include subscriber PCs networked together with other computers on a local area network ("LAN"). '468 Patent, Fig. 1, 3:55–58. Additional network elements may be located between the "service provider network" and the subscriber's premises to aid in the distribution of content. '468 Patent, 1:33–35.

Fig. 1, reproduced below with annotations, illustrates separation between devices at a subscriber's premises (subscriber terminals and communication gateways connected via a LAN) and the "service provider network" (i.e., SPA Network Elements 54).



*Unified Patents, Inc. v. Multimedia Content Management LLC*, IPR2017-01934, Patent Owner's Preliminary Response (PTAB Dec. 14, 2017), Paper 9, at 6 (annotating '468 Patent, Fig. 1). Figure 1 also illustrates that the "service provider network" 54 is distinct from Non-SPA Network Elements 55. Collectively, the "service provider network" and Non-SPA Network Elements comprise the Internet/Metro Area Network 52. Thus, the service provider network does not include equipment located at subscriber's premises on the other side of the LAN.

Further, the file history of the '468 Patent supports Plaintiff's constructions. During prosecution, Patentee amended the claims to clarify that the "network" recited in Claim 1 is the "service provider network" as opposed to being any network, such as the subscriber's local area

network or the entire public Internet. Supplemental Preliminary Amendment for U.S. Pat. App. No. 13/369,174, Nov. 15, 2012, attached hereto as EX2002, p. 124. During the IPR, Mr. Williams testified that the "service provider network" is not the entire public Internet and only includes those network elements operated or controlled by the service provider. Further, the service provider network does not include the subscriber equipment (e.g., subscriber PC) nor the subscriber LAN located at the subscriber's premises. EX2001, ¶ 47–57.

Therefore, in view of the specification of the '468 Patent and the filed history, Plaintiff submits that the proper construction of "service provider network" is "a network that is operated or controlled by a service provider to provide regulated access to content delivery services for subscribers, but not including subscriber equipment or a subscriber network."

Defendant's proposed construction improperly adds an extraneous limitation, i.e., "*only* includes those network elements operated or controlled by the service provider." JCCS, Ex.A-4 (emphasis added). *See Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989) ("[L]imitations appearing in the specification will not be read into claims, and that interpreting what is meant by a word in a claim 'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.'" "); *see also Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 797 (Fed. Cir. 2019) (cautioning against "improperly importing limitations into the claims."). Defendant's construction would define a network in a manner that would exclude any features that are common to multiple networks, but necessary for the network's operation. For example, Defendant's construction would exclude the physical cables connecting devices if every portion of that cable were not "operated or controlled by the service provider."

Defendant's construction is also inconsistent with the specification of the '468 Patent. For example, Figure 1 illustrates SPA Network Elements 54 as part of an "Internet/Metro Area

Network." In common configurations, even privately-controlled networks can use commonly-controlled (or shared usage) communication pathways (e.g., towers, cables, switches, etc.) to route communication between and among privately-controlled network elements. Defendant's construction would exclude all such commonly-controlled (or shared usage) communication pathways from the definition of "service provider network."

The proper construction of "service provider network" based on the '468 Patent in its entirety, the file history, as well as the understanding of one of ordinary skill in the art, is Plaintiff's proposed construction: "a network that is operated or controlled by a service provider to provide regulated access to content delivery services for subscribers, but not including subscriber equipment or a subscriber network." JCCS, Ex. A-4.

**D.  Disputed Term No. 4 – "selectively transmit[ting, by the plurality of gateway units,] the content requests to the service provider network in accordance with the controller instructions"**

| Plaintiff's Construction | Defendant's Construction |
| --- | --- |
| "a gateway unit, under control of the remotely located controller node, executes previously received controller instructions to determine whether to transmit a content request from a user or to take other action (e.g., deny the content request, redirect the content request, or notify authorities regarding the content request)" | "transmitting all content requests to take place within the service provider network in response to the controller instructions' decision to transmit the content requests" |

Plaintiff's proposed construction is supported by and consistent with the specification of the '468 Patent. For example, the '468 Patent describes "a gateway unit associated with a user receives controller instructions from the network." '468 Patent, 7:54–65 (internal citations omitted). First, after receiving the controller instructions, "the gateway unit receives a network access request from a user, via a subscriber terminal." *Id.* Second, the gateway unit determines whether or not to transmit the network access requests over the network in accordance with the controller instructions. *Id.* Third, the gateway either transmits the network access requests or takes

another action (e.g., denies access or contacts law enforcement). *Id.* 7:53–8:18 (describing "Conditional Denial), 10:31–39 (describing denial of service attacks on targets identified by law enforcement). The '468 Patent explicitly describes these steps as "a method for *selectively transmitting* network access requests." *Id.* at 3:22–24 (emphasis added) (describing Figure 5).

As a further example, the specific embodiment of Figure 5 describes gateway units, in accordance with previously-received controller instructions, acting to deny "subscribers the capability to send or to receive data from or to 'pirate' URLs or IP addresses that are known to contain unlicensed copyrighted material." *Id.* at 7:66–8:10. Another example in the '468 Patent describes gateway units "selectively inhibit[ing] access to a portion of the content servers by a second group of users in accordance with the controller instructions." *Id.* at 9:66–10:6. Gateway units may also be "directed by instructions received from an ICP 50 to initiate repeated requests for service or other similar transactions to URLs or IP addresses of 'pirate' sites . . . in an ICP-delivered conditional denial of service list." *Id.* at 10:7–13. In addition to "directing denial of service attacks . . . ICP 50 may direct CGs 58 and SPA-controlled network elements 54 to perform similar attacks on URLs or IP addresses identified by a government or law enforcement body." *Id.* at 10:31–39.

Other embodiments in the '468 Patent describe a gateway unit determining whether or not to transmit a content request from a user. For example, when describing Figure 7, the '468 Patent describes a gateway unit "selectively forward[ing] the first portion of content data to a second [gateway] unit in accordance with the content distribution instructions."[3] *Id.* at 13:2–7. Further, in response to a subscriber's request for content, the subscriber may have access to all content stored

---

[3] The quotation from the '468 Patent uses the term "second network unit," which Plaintiff believes in this context to be coextensive with "gateway unit."

on the network portion of both their own gateway unit and other gateway units under control of a controller node. *Id.* at 13:55–58. "When many subscribers request the same content, then [the controller node] directs a replication of content as it is distributed to" the gateway units. *Id.* at 13:58–60. The controller node "directs content to be delivered to the requesting" gateway from the service provider network if the "file is not available" from any other gateway unit. *Id.* at 13:65–14:1.

Therefore, in view of the specification of the '468 Patent, Plaintiff proposes to construe "selectively transmit the content requests to the service provider network in accordance with the controller instructions" as: (1) "a gateway unit." As detailed above, a gateway unit can be responsible for selectively transmitting content requests. '468 Patent, 7:54–65 ("[A] gateway unit associated with a user receives controller instructions from the network." (2) the gateway unit is "under control of the remotely located controller node." As detailed above, the gateway unit performs functions such as conditional denial in response to controller instructions from the remotely-located controller node. '468 Patent, FIG. 1, 7:54–65, 7:53–8:18. (3) The gateway unit "executes previously received controller instructions to determine whether to transmit a content request from a user or take other action." As detailed above, the gateway unit can execute previously received controller instructions to determine whether to transmit a content request from a user or to take other actions" such as denying the content request, '468 patent, 7:53–8:18, redirect the content request, *id.* at 8:11–18, or notify authorities regarding the content request, *id.* at 10:31–39.

Defendant's proposed construction improperly reads out the "selective" part of "selectively transmit." *See Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) (noting "interpretations that render some portion of the claim language

superfluous are disfavored"); see also *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.") (internal citations omitted). Defendant's proposed construction would require a gateway unit to transmit "*all* content requests." This construction conflicts with the specification of the '468 Patent, which describes, for example, a gateway unit "selectively forward[ing] the first portion of content data to a second [gateway] unit in accordance with the content distribution instructions,"[4] '468 Patent, 13:2–7, as well as the '468 Patent's example of *denying* access, *id.* at 8:11–18. A proper construction of "selectively transmit" cannot encompass both denying access and transmitting all content requests.

Accordingly, the proper construction of "selectively transmit the content requests to the service provider network in accordance with the controller instructions" based on the '468 Patent in its entirety is Plaintiff's proposed construction: "a gateway unit, under control of the remotely located controller node, executes previously received controller instructions to determine whether to transmit a content request from a user or to take other action (e.g., deny the content request, redirect the content request, or notify authorities regarding the content request)."

**E.  Disputed Term No. 5 – "gateway units"**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| "a computer device that is located within a subscriber premise, remote from the controller node, that is under control of the controller node, and that is usable by a subscriber to perform certain functionality only as permitted by the controller node" | "computer devices that are remote from the controller node and interface with the service provider network and a subscriber terminal" |

Plaintiff's proposed construction is supported by and consistent with the specification of the '468 Patent. For example, the '468 Patent describes gateway units as usable by a subscriber to

---

[4] The quotation from the '468 Patent uses the term "second network unit," which Plaintiff believes in this context to be coextensive with "gateway unit."

perform certain functionality only as permitted by the controller node. Specifically, a gateway unit cannot be used by a subscriber to perform functionality ***that is not permitted*** by the controller node. The '468 Patent describes these limitations in the context of the needs and requirements of service providers to protect the digital rights of content providers. '468 Patent, 4:47–48 ("This secure flow of data then enables ISPs to effectively and efficiently control the services provided to subscribers."). In order to protect the digital rights of content providers, the gateway units described in the '468 Patent are tamper-proof, such that subscribers cannot access the device's hardware or software:

> The [gateway units] ***cannot be tampered with by subscribers***. [The gateway units] are specifically designed to permit no subscriber-initiated programming and no access to the [gateway unit's] hardware or software.[5]

'468 Patent, 3:62–65 (emphasis added). The '468 Patent describes in detail how the tamper-proof provisions of the gateway units are used to ensure digital rights. *E.g.*, '468 Patent, 4:1–5 ("Updates to this [compiled] code are obtained from ICPs and encrypted passwords are stored in hidden, undocumented locations to allow authentication of ICP presence prior to [gateway unit] control program update."); 4:6–10 ("[O]ne or more 'deadman' switches [] are tripped upon opening the housing or removing a [gateway unit's] hard drive."); 4:28–32 ("These measures prevent subscribers from writing, compiling, executing, modifying, or otherwise tampering with the operating software of the [gateway unit.] Second, the active mode prevents users from getting access to the content of the hard drive."); 4:38–39 ("An ICP will not enable any service to an un-

---

[5] The specification refers to Communications Gateways **58** as CGs. The claimed gateway units correspond to the CGs. For ease of reading, CG was replaced with gateway unit in this quote.

registered [gateway unit] and an un-registered [gateway unit] will not operate in an experimental environment at all."); 4:46–48 ("These measures ensure secure control of the data flow between both the ICP and the [gateway unit]. ***This secure flow of data enables ISPs to effectively and efficiently control the services provided to subscribers***.") (emphasis added).

Further, the file history of the '468 Patent supports Plaintiff's construction. For example, during the IPR, Mr. Williams testified that a person of ordinary skill in the art would understand the meaning of "gateway unit" as recited in the claims and described in the specification to exclude a device in which the subscriber (e.g., an end user) has access to the device's hardware or software. EX2001, ¶¶ 70-73.

Therefore, in view of the specification of the '468 Patent and the file history (in particular, Mr. Williams's testimony in the IPR cited above), Plaintiff submits the proper construction of "gateway unit" is "a computer device that is located within a subscriber premise, remote from the controller node, that is under control of the controller node, and that is usable by a subscriber to perform certain functionality only as permitted by the controller node." JCCS, Ex. A-7.

Defendant's proposed construction is unreasonably broad in view of the '468 Patent specification. For example, Defendant's proposed construction would encompass a subscriber's home router—a device that "interfaces with the service provider network" and a "subscriber terminal."[6] This is inconsistent with the specification of the '468 Patent. A conventional home router is not controlled by the service provider and is not limited to perform operations required by the service provider (e.g., copyright registry, '468 Patent, 11:1–8, copyrighted file deletion, *id.*

---

[6] The '468 Patent defines a "subscriber terminal" as being "located at subscriber premises and include[ing], for example, personal computers, televisions configured with modems, a combination of both, or any other combination of consumer electronics capable of presenting electronic content to a subscriber." '468 Patent, 1:35–41.

at 11:9–21, first portal visibility, *id.* at 22–43, etc.). Further, a conventional home router does not include the security features described by the '468 Patent as being required for a gateway unit (e.g., anti-tampering measures, *id.* at 4:6–32). Any proper construction of gateway unit must include the element of being controlled by the controller node in order to provide the security features described in the '468 Patent.

Thus, the proper construction of "gateway unit" based on the '468 Patent in its entirety is Plaintiff's proposed construction: "a computer device that is located within a subscriber premise, remote from the controller node, that is under control of the controller node, and that is usable by a subscriber to perform certain functionality only as permitted by the controller node." JCCS, Ex. A-7.

### F.  Disputed Term No. 6 – "gateway nodes"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| "a computer device that is located within a subscriber premise, remote from the controller node, that is under control of the controller node, and that is usable by a subscriber to perform certain functionality only as permitted by the controller node" | "computer devices that are remote from the controller node and interface with the service provider network and a subscriber terminal" |

The term "gateway nodes" appears in dependent Claim 27 of the '468 Patent. Plaintiff's proposed construction is consistent with the specification of the '468 Patent. Specifically, Plaintiff's proposed construction is consistent with the fact that "gateway node," as that term is used in Claim 27, is coextensive with the term "gateway unit," as that term is used in independent Claim 23, discussed in detail in Section III.5 *supra*. Claim 27 depends from Claim 25, which depends from Claim 23. The term "gateway nodes" appears for the first time in the '468 Patent in Claim 25, which recites the "method of Claim 23, further comprising *the gateway nodes* denying access to a first group of network servers of the service provider network, in accordance with the

controller instructions." '468 Patent, 21:14–18 (emphasis added). The term "gateway nodes" does not appear in Claim 23. The appropriate antecedent basis for "the gateway nodes," therefore, are the "gateway *units*" recited in Claim 23. *Id.* at 63–64.

The understanding that "gateway nodes" are intended to refer to the same devices as "gateway units" is supported by the specification. For example, Claim 27 recites the "gateway nodes detecting a content request that designates a first network server of the service provider network; and re-directing the content request to a second network server of the service provider network." *Id.* at 21:22–26. The '468 Patent describes similar functionality being performed by a "CG 58," which also corresponds to the "gateway unit" of Claim 23. '468 Patent 7:66–8:15 ("Furthermore, when other non-web browser programs executing in subscriber terminals 60 attempt to access a blocked site, the request to the URL or IP address of the blocked site may be redirected to a legal content provider's URL or IP address or ignored.").

Therefore, in view of the specification of the '468 Patent, Plaintiff proposes to construe "gateway nodes" as coextensive with "gateway units," as "a computer device that is located within a subscriber premise, remote from the controller node, that is under control of the controller node, and that is usable by a subscriber to perform certain functionality only as permitted by the controller node."

Defendant does not appear to dispute that "gateway nodes" should be interpreted in the same way as "gateway unit." JCCS, Ex. A-7 to A-8. However, Defendant's proposed construction of "gateway nodes" suffers from the same flaws as its proposed construction of "gateway unit." Specifically, Defendant's proposed construction is improperly broad. For example, as detailed above, Defendant's proposed construction would encompass a subscriber's home router—a device

that "interfaces with the service provider network" and a "subscriber terminal."[7] This is inconsistent with the specification of the '468 Patent which describes a gateway unit as "selectively transmit[ting] the network access requests over the network in accordance with the controller instructions." '468 Patent, 7:54–65 (internal citations omitted). Nothing in Defendant's proposed construction accounts for the '468 Patent's requirement that the gateway unit be "under control of the controller node," as Plaintiff's proposed construction states.

The proper construction of "gateway node" based on the '468 Patent in its entirety is Plaintiff's proposed construction: "a computer device that is located within a subscriber premise, remote from the controller node, that is under control of the controller node, and that is usable by a subscriber to perform certain functionality only as permitted by the controller node." JCCS, Ex. A-8.

### G.  Disputed Term No. 7 – "if the gateway unit enters the inactive state"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| "within a reasonable time before or after the gateway unit enters the inactive state" | Plain and ordinary meaning, no construction necessary with construction of overlapping terms as proposed above |

Plaintiff's proposed construction is consistent with the specification of the '468 Patent. Specifically, Plaintiff's construction reflects that "if the gateway unit enters the inactive state," in the context of the '468 Patent, should be understood as "within a reasonable time *before or after* the gateway unit enters the inactive state." The '468 Patent describes gateway units as being able to "carry out" previously delegated activities while inactive. *E.g.*, '468 Patent, 7:48–52; 10:7–30 (describing inactive CGs as being able to be "directed by instructions received" to "initiation

---

[7] The '468 Patent defines a "subscriber terminal" as being "located at subscriber premises and include[ing], for example, personal computers, televisions configured with modems, a combination of both, or any other combination of consumer electronics capable of presenting electronic content to a subscriber." '468 Patent, 1:35–41.

repeated requests for service or other similar transactions"). The '468 Patent is agnostic on the temporal relationship between *when* the gateway unit enters the inactive state and *when* the gateway unit notifies the controller node that the gateway unit has entered the inactive state. *See, e.g.*, '468 Patent, 7:35–39 ("Upon power down or inactivity timeout of CG 58, CG 58 may register itself as 'idle' by sending an event notification to ICP 50."). Therefore, any attempt to read in a temporal relationship between the gateway unit entering the inactive state and the gateway unit notifying the controller node would be inconsistent with the specification of the '468 Patent.

The proper construction of "if the gateway enters the inactive state," based on the '468 Patent in its entirety is Plaintiff's proposed construction: "within a reasonable time before or after the gateway unit enters the inactive state." JCCS, Ex. A-9.

## H. Disputed Term No. 8 – "registration information"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| "information that associates a gateway unit with a controller node" | Plain and ordinary meaning, no construction necessary |

Plaintiff's proposed construction is consistent with the specification of the '468 Patent. Specifically, Plaintiff's construction reflects that "registration," in the context of the '468 Patent, should be understood as "associates a gateway unit with a controller node." See, e.g., '468 Patent, 7:20–33 ("The registration process may include collection of information by ICP 50 for a warranty registration from the subscriber such as, for example, CG's 58 hardware address and other identifying data. ICP 50 will then send CG 58 the latest operating software, if necessary, and its initial operating parameters to load in memory 104."); *see also* '468 Patent, 8:16–18, 15:10–18.

## I. Disputed Term No. 9 – "uniquely"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| "possessing, within a network, a characteristic of a device that is not shared by other devices within the network"" | Plain and ordinary meaning, no construction necessary |

Plaintiff's proposed construction is consistent with the specification of the '468 Patent. Specifically, Plaintiff's construction reflects that "unique," in the context of the '468 Patent, should be understood as unique *within the network* (as opposed to globally unique). *See, e.g.*, '468 Patent, 13:39–42 (describing as "unique identifying information" an "IP address" for a gateway unit).

### J.   Disputed Term No. 13 – "initial operating parameters"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| "one or more variables associated with an operating mode first entered into by a gateway unit after registration" | Plain and ordinary meaning, no construction necessary |

Plaintiff's proposed construction is consistent with the specification of the '468 Patent. Specifically, Plaintiff's construction reflects that "initial," in the context of the '468 Patent, should be understood as "first entered into by a gateway unit after registration." *See, e.g.*, '468 Patent, 7:23–33 (distinguishing "initial" registration, and its associated operating parameters, from "[s]ubsequent re-registrations" that "may be initiated by CG 58 under subscriber control for address or ISP changes.").

## VI.   DISPUTED TERMS OF THE '925 PATENT

The disputed terms for the '925 Patent are presented with the same numbering as in the JCCS, Docket 39. DISH has proposed these terms for construction. Certain terms of the '925 Patent are substantively the same as terms in the '468 Patent. Those terms— (1) "to generate controller instructions," (2) "controller node," (3) "service provider network," (4) "selectively transmitting," and (5) "gateway unit"—have been fully briefed above.

### A.   Disputed Term No. 5 – "network elements"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| "a computer device that is located remote from the controller node, that is under control of the controller node, and that is usable by a | "computer devices within the service provider network" |

| subscriber to perform certain functionality only as permitted by the controller node" | |
|---|---|

Plaintiff's proposed construction is supported by, and consistent with, the specification of the '925 Patent. For example, Figure 1 of the '925 Patent, reproduced below, illustrates "SPA Network Elements" 54 and "Non-SPA Network Elements" 55 as located within "Internet/Metro Area Network 52" and remote from "Internet Control Point" 50 (i.e., a controller node).



Figure 1

'925 Patent, FIG. 1. Further, the '925 Patent describes network elements, "including, for example, powered up and inactive CGs 58 and SPA-controlled network elements 54" that "may be *directed by instructions received from and ICP* 50 to initiate repeated requests for service or other similar transactions." '925, 10:34–38 (emphasis added). The '925 Patent describes various functions that a subscriber may use only as permitted by the controller node. *E.g.*, '925 Patent, 10:34–65 ("In addition to directing denial of service attacks on URL's or IP addresses in the conditional denial of service list, ICP 50 may direct CGs 58 and SPA-controlled network elements 54 to perform similar attacks on URLs or IP addresses identified by a government or law enforcement body . . . .").

Therefore, in view of the specification of the '925 Patent, Plaintiff submits that the proper construction of "network elements" is "a computer device that is located remote from the controller

node, that is under control of the controller node, and that is usable by a subscriber to perform certain functionality only as permitted by the controller node."

Defendant's proposed construction is unreasonably broad in view of the '925 Patent specification. For example, Defendant's proposed construction would encompass conventional switching equipment within the service provider network. This is inconsistent with the specification of the '925 Patent. A conventional network switch does not include the security features described by the '925 Patent as being required for a network element. The '925 Patent states: "These [security] measures ensure secure control of the data flow between both the ICP and the CG." '925 Patent, 4:60–62. As illustrated in Figure 1, the SPA network elements 54 are part of the "data flow between both the ICP and the CG." It is this secure flow of data that "then enables ISPs to effectively and efficiently control the services provided to subscribers." *Id.* at 4:63–65.

Thus, the proper construction of "network elements" based on the '925 Patent in its entirety is Plaintiff's proposed construction: "a computer device that is located remote from the controller node, that is under control of the controller node, and that is usable by a subscriber to perform certain functionality only as permitted by the controller node."

**B.  Disputed Term No. 8 – "subscriber management system"**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| "a system that manages subscriber devices of a service provider network, the subscriber management system being part of the service provider network" | Plain and ordinary meaning, no construction necessary |

Plaintiff's proposed construction is consistent with the specification of the '925 Patent. Specifically, Plaintiff's construction reflects that "subscriber management system," in the context of the '925 Patent, should be understood as managing subscriber devices *of the service provider network. See, e.g.*, '925 Patent, 7:33–41, 10:15–21.

### C. Disputed Term No. 9 – "authenticate subscribers or devices before allowing access into the service provider network"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| "identifying subscribers or devices that are allowed to access a requested service provided by the service provider network" | Plain and ordinary meaning, no construction necessary with construction of overlapping terms as proposed above |

Plaintiff's proposed construction is consistent with the specification of the '925 Patent. Specifically, Plaintiff's construction reflects that "authenticate," in the context of the '925 Patent should be understood as identifying those subscribers or devices that are allowed to access a requested service provided by the service provider network. *See, e.g.*, '925 Patent, 12:24–26 ("Subscribers who subscribe to fee-based services such as video calling, games or gambling may receive applet downloads from ICP 50 or from SPA content server 56."); *see also generally* '925 Patent, 10:15–21, 4:7–19, 7:33–41, 15:9–30.

Dated: March 21, 2019

Respectfully submitted,

*/s/ Jeffrey G. Toler*
Jeffrey G. Toler
Aakash S. Parekh
Benjamin R. Johnson (*pro hac vice*)
TOLER LAW GROUP, PC
8500 Bluffstone Cove
Suite A201
Austin, TX 78759
(512) 327-5515
jtoler@tlgiplaw.com
aparekh@tlgiplaw.com
bjohnson@tlgiplaw.com

**Attorneys for Plaintiff Multimedia Content Management LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 21, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record in the above-reference matter.

*/s/ Angie K. Blazek*
Angie K. Blazek
TOLER LAW GROUP, PC
8500 Bluffstone Cove
Suite A201
Austin, TX 78759
(512) 327-5515
