**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| MULTIMEDIA CONTENT MANAGEMENT LLC, Plaintiff | § § § § | Civil Action No.: 6:18-cv-00207-ADA |
| | § | JURY TRIAL DEMANDED |
| v. | § § | PATENT CASE |
| DISH NETWORK L.L.C., Defendant. | § § § § | |

**DEFENDANT'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

## <u>TABLE OF CONTENTS</u>

I.  CONSTRUCTION OF INDEPENDENT CLAIM TERMS ................................................. 1

    A.  Term 1: "to generate controller instructions" ('468 Patent: Claim 1 / '925 Patent: Claim 1) or "generating controller instructions" ('468 Patent: Claim 23 / '925 Patent: Claim 29) ...................................................................................... 1

    B.  Term 2: "a controller node" ('468 Patent: Claims 1 and 23 / '925 Patent: Claims 1 and 29) ............................................................................................................... 6

    C.  Term 3: "a service provider network" ('468: Claims 1 and 23 / '925: Claims 1 and 29) ............................................................................................................... 10

    D.  Term 4: "selectively transmit[ting, by the plurality of gateway units,] the content requests to the service provider network in accordance with the controller instructions" ('468: Claims 1 and 23 / '925: Claims 1 and 29) .................. 14

    E.  Term 5: "gateway units" ('468 Patent: Claims 1 and 23) ........................................... 18

    F.  Term 6: "network elements" ('925: Claims 1 and 29) ................................................. 20

II. CONSTRUCTION OF DEPENDENT CLAIM TERMS ................................................. 21

    A.  Term 1: "if the gateway unit enters the inactive state" ('468: Claim 29) .................. 23

    B.  Term 2: "registration information" ('468: Claim 33) .................................................. 24

    C.  Term 3: "uniquely" ('468: Claim 24) .......................................................................... 25

    D.  Term 4: "initial operating parameters" ('468: Claim 33) ............................................ 26

    E.  Term 5: "subscriber management system" ('925: Claim 25) ...................................... 27

    F.  Term 6: "authenticate subscribers or devices before allowing access into the service provider network" ('925: Claim 25) .............................................................. 27

III. CONCLUSION ............................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Altiris, Inc. v. Symantec Corp.*,
    318 F.3d 1363 (Fed. Cir. 2003).....................................................................................22

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
    637 F.3d 1324 (Fed. Cir. 2011)....................................................................................11

*Andersen Corp. v. Fiber Composites, LLC*,
    474 F.3d 1361 (Fed. Cir. 2007)....................................................................................13

*Arendi S.A.R.L. v. Google LLC*,
    882 F.3d 1132 (Fed. Cir. 2018)......................................................................................2

*Aylus Networks, Inc. v. Apple Inc.*,
    856 F.3d 1353 (Fed. Cir. 2017).................................................................................2, 11

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*,
    224 F.3d 1308 (Fed. Cir. 2000)....................................................................................20

*DSW, Inc. v. Shoe Pavilion, Inc.*,
    537 F.3d 1342 (Fed. Cir. 2008)....................................................................................22

*Enzo Biochem Inc. v. Applera Corp.*,
    780 F.3d 1149 (Fed. Cir. 2015)......................................................................................4

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
    755 F.3d 1367 (Fed. Cir. 2014)......................................................................8, 9, 23, 25

*In re Johnston*,
    435 F.3d 1381 (Fed. Cir. 2006)....................................................................................17

*In re Packard*,
    751 F.3d 1307 (Fed. Cir. 2014)......................................................................................9

*InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*,
    690 F.3d 1318 (Fed. Cir. 2012)....................................................................................18

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.*,
    887 F.2d 1050 (Fed. Cir. 1989)......................................................................................5

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995)........................................................................................23

*Merck & Co. v. Teva Pharm. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005)......................................................................................5

*Northern Telecom Ltd. v. Samsung Elecs. Co.*,
  215 F.3d 1281 (Fed. Cir. 2000)................................................................................22

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005).................................................................8, 16, 22, 23, 28

*Seachange Int'l, Inc. v. C-COR, Inc.*,
  413 F.3d 1361 (Fed. Cir. 2005)................................................................................22

*Sorensen v. Int'l Trade Com'n*,
  427 F.3d 1375 (Fed. Cir. 2005)..................................................................................2

*The Medicines Co. v. Mylan, Inc.*,
  853 F.3d 1296 (Fed. Cir. 2017)................................................................................15

*Toshiba Corp. v. Imation Corp.*,
  681 F.3d 1358 (Fed. Cir. 2012)..................................................................................8

MCM's opening brief proposes constructions for six independent claim terms and six dependent claim terms. For the independent claim terms, MCM cherry picks portions of the intrinsic record to support its proposed constructions while ignoring its own unequivocal disclaimers made during the prior Unified Patents IPR. As DISH explained in its opening brief, the public is entitled to rely on all statements found in the intrinsic record that inform and define the scope of the claims of the Asserted Patents, not just the ones MCM now deems relevant. For the dependent claim terms, MCM provides no reason why this Court should depart from the plain and ordinary meaning for those terms. MCM fails to establish that the Applicant acted as its own lexicographer or otherwise altered the ordinary definition of these easily understood terms.

## I.    CONSTRUCTION OF INDEPENDENT CLAIM TERMS

### A.    Term 1: "to generate controller instructions" ('468 Patent: Claim 1 / '925 Patent: Claim 1) or "generating controller instructions" ('468 Patent: Claim 23 / '925 Patent: Claim 29)

| MCM's Construction | DISH's Construction |
|---|---|
| "generate computer processor-executable instructions, excluding merely a uniform resource locator (URL) or an internet protocol (IP) address" | "to create[ing] or bring[ing] into being computer executable instructions that determine whether to transmit or not transmit a content request from a user to the service provider network" |

The dispute between the parties concerns two issues: (1) whether instructions must be created and not simply transmitted or relayed to qualify as the claimed "controller instructions" and (2) whether the claimed intrinsic evidence supports the understanding that "controller instructions" must decide whether or not to transmit content requests. As shown in DISH's opening brief and below, the specification and MCM's concessions in the prior IPR answer both of these questions in the affirmative. MCM's construction does not address these issues and instead imports a characteristic of controller instructions, that they cannot be a URL or IP address.

DISH does not dispute this feature as the ordinary meaning of controller instructions requires more than a URL or IP address.

              1.       *MCM Declines to Construe the Term "Generate" Despite Giving the Term Specific Meaning to Overcome Prior Art in the Unified Patents IPR*

In support of its construction, MCM includes no citation to any portion of the specifications of the Asserted Patents, because the specification provides no guidance as to what "generate" actually means.  Thus, the prosecution history, including the statements made by MCM in IPR, must be considered to construe this term.  *Arendi S.A.R.L. v. Google LLC*, 882 F.3d 1132, 1135 (Fed. Cir. 2018) ("In construing patent claims, a court should consult the patent's prosecution history so that the court can exclude any interpretation that was disclaimed during prosecution.") (quoting *Sorensen v. Int'l Trade Com'n*, 427 F.3d 1375, 1378 (Fed. Cir. 2005)); *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017) (extending prosecution disclaimer doctrine to IPR proceedings).  MCM's opening brief recognizes that in MCM's Patent Owner Preliminary Response ("POPR"), MCM conceded that "a person of ordinary skill in the art would understand the meaning of 'generate' to **exclude** operations in which the controller instructions are **only transmitted or relayed** by a device (i.e., brought 'into being')."  Dkt. No. 51 at 12 (emphases added).  DISH's proposed construction accurately reflects that concept using the identical language MCM used: "the generated item did not exist prior to being generated."  Dkt. No. 48, Ex. A at 12-13.

Accordingly, MCM's allegation that DISH's use of "create or bring into being" for its construction is "inconsistent with the understanding of one of ordinary skill in the art as disclosed in the file history" is simply wrong.  *See* Dkt. No. 51 at 12.  DISH's construction of "create or bring into being" for "**generate** controller instructions" relies upon the dictionary definition of the word "generate" and comports with MCM's unequivocal requirement that the functions of

"transmitting" or "relaying" cannot be encompassed within generating controller instructions. In sharp contrast, MCM's construction merely reuses the term "generate" to potentially include "transmit" or "relay." Additionally, claim 1 already separately recites a step to "transmit the controller instructions." If "generating" could include only transmitting instructions it received rather than "creating" its own instructions, "generate" would have no meaning.

    2.    *DISH's Construction Properly Includes the Limitation "Determine Whether to Transmit or Not to Transmit a Content Request" with this Term*

MCM does not dispute that the overall claim needs to make a "determination" of "whether to transmit a content request." *See* Dkt. No. 51 at 12, 17-20 (MCM construing "selectively transmitting" to include "to determine whether to transmit a content request from a user or to take other action"). Rather, MCM suggests that the intrinsic evidence supports the "controller instructions" performing more than determining whether or not to transmit a content request. This is not the case. The proper construction of this term includes the "determining whether to transmit or not transmit" limitation, where the "determining" aligns with the function and purpose of the "controller instructions."

The context of the claims concerns regulating access to content. The specification uniformly describes the functionality of the "controller instructions" as "determining whether to transmit or not transmit content requests" and not anything else. *See, e.g.*, '468 Patent at 2:23-3:2 ("the second processor ***selectively transmitting at least some of the network access requests*** over the network ***in accordance with the controller instructions***") (emphases added); 7:54-65 ("At step 404, the gateway unit ***selectively transmits the network access requests*** over the network ***in accordance with the controller instructions***.") (emphases added); 9:64-10:6 ("Next, at step 502, ***the network unit selectively inhibits access to a portion of the content servers*** by a second group of users ***in accordance with the controller instructions***.") (emphases added). The specification

as a whole shows using the controller instructions "to determine whether to transmit or not transmit a content request." Thus, the specification demonstrates that the ordinary meaning of "controller instructions" as used in the Asserted Patents requires determining whether or not to transmit content requests.

MCM's assertion that "the '468 Patent describes multiple examples of operations performed by gateway units that execute the controller instructions" lacks any support in the specification. Dkt. No. 51 at 11. The citations MCM relies upon do not describe or even mention any "controller instructions." MCM states:

> One such example operation, entitled "Active and Inactive CG [Communication Gateway] Processing Control," is used by a communication gateway to "register itself as 'idle' by sending an event notification to ICP 50." *Id.* at 7:34–37. "Inactive CGs 58 may *process and control either CG maintenance* or may carry out activity delegated to inactive CGs by design." *Id.* at 50–52 (emphasis added). There is nothing in the specification of the '468 Patent to suggest that the operation of processing and controlling communication gateway maintenance is the same as or related to determining "whether to transmit or not transmit a content request," as Defendant's construction would require.

*Id.* These example operations are not done "***in accordance with controller instructions***" nor do they reference any "controller instructions." *See id.* Instead, the specification only describes the controller instructions in the context of "determining whether to transmit or not transmit a content request."

MCM's construction would read terms out of the claim. *See Enzo Biochem Inc. v. Applera Corp.*, 780 F.3d 1149, 1154 (Fed. Cir. 2015) (rejecting construction that reads out a claim term and "thus, impermissibly broaden[s] the claim"). In effect, MCM construes "generate controller instructions" as "generate computer processor-executable instructions," while only specifying what a controller instruction cannot by itself be: a URL or IP address. However, this does not construe the "controller" aspect of the "controller instructions." The claims function to control access to content using controller instructions. Dkt. No. 51 at 6-7 ("The instructions control the

operation of the CGs."); '468 Patent, Claims 1 and 23.  By construing the controller instructions as generic computer processor-executable instructions that cannot be a URL or IP address, MCM reads "controller" out of the claim.  The "controller" portion reflects that a determination must be made.  Only DISH's construction reflects the meaning of all terms.  *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

        3.     *MCM's Proposed Construction, by its Own Arguments, Imports an Unnecessary Limitation*

MCM argues that "one of ordinary skill in the art would understand a 'controller instruction' to exclude merely a uniform resource locator ('URL') or an internet protocol ('IP') address." Dkt. No. 51 at 10.  In support of this argument, MCM relies exclusively on a declaration from MCM's expert, Joel Williams, that MCM submitted as part of its Patent Owner Preliminary Response in the Unified Patents IPR.  *See id.* at 9-12.  While DISH does not dispute that to be true, MCM fails to explain how the negative limitation "excluding merely a uniform resource locator (URL) or an internet protocol (IP) address" clarifies "controller instructions" or amounts to more than an improper importation of an ancillary term.  *See Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989) ("limitations appearing in the specification will not be read into the claims").

MCM provides no explanation for why the negative limitation is needed or appropriate. Indeed, MCM appears to concede that a "controller instruction" might include a URL or IP address with something more.  Dkt. No. 51 at 10 ("the URLs and IP addresses ***alone*** are not controller instructions.") (emphasis added).  If one of ordinary skill in the art understands a "controller instruction" excludes a URL or IP address, then the limitation "excluding merely a uniform resource locator (URL) or internet protocol (IP) address" is redundant and unnecessary.  The added

limitation will only confuse a jury without providing any meaningful guidance. Further, MCM contends that "[i]n the art of computer networks, an instruction describes a command to be performed" and "[a]n address, either in URL or IP form, is not a command and does not describe an operation to be performed." Dkt. No. 51 at 10. MCM's own statements support an understanding that "instruction" excludes a URL or IP address alone, thus rendering MCM's importation of the limitation extraneous.

This Court should reject MCM's construction, which includes an unnecessary and unsupported limitation, and adopt DISH's construction, which provides clarity to the term "generate" and is consistent with the claims and specification.

**B.    Term 2: "a controller node" ('468 Patent: Claims 1 and 23 / '925 Patent: Claims 1 and 29)**

| MCM's Construction | DISH's Construction |
|---|---|
| "a network-based router or computer located within the network and remote from the [gateway unit / network element] and that controls the operation of one or more [gateway units / network elements]" | "a single network device that controls the operation of the gateway units" |

DISH's construction that "a controller node" is a ***single*** network device is required in view of the full intrinsic record which dictates that the "generating" and "transmitting" controller instructions must be performed by the same device, and ***not by*** multiple devices in a distributed manner. MCM attempts to recast that argument by suggesting that DISH is limiting an entire network to a single controller node. That is not the case. DISH does not dispute that multiple controller nodes can be in a network. However, the intrinsic evidence mandates that each controller node must be a single device that both "generates" and "transmits" the controller instructions.

MCM's construction seeks to import features from the specification such as placing a controller node "within the network" and "remote from the gateway unit." These features do not belong in the construction and do not make sense in the context of the claims.

       1.     *"[A] Controller Node" Must be a Single Device When Interpreted in Context of the Claims and MCM's Statements in IPR Proceedings*

MCM argues that because the specification refers to the Internet Control Point ("ICP") in plural form, DISH's construction cannot be correct. Dkt. No. 51 at 14. MCM's reliance is misplaced. Specifically, MCM states:

> In fact, the '468 Patent explicitly contradicts Defendant's construction: "The *ICPs a*re installed in an ISP's network. ICPs may be *network-based routers or computers* that control the operation of CGs." '468 Patent, 3:43–47 (emphasis added). ***Every term in this portion of the '468 Patent is plural. The '468 Patent expressly considers multiple "network-based routers or computers." Id.***

*Id.* (emphasis added).

DISH does not dispute that there may be more than one "controller node" in any network. However, the intrinsic evidence demonstrates that ***each*** controller node must be "a ***single*** network device" that performs the "generate" and "transmit" functions. First, the claims require that a controller node must be the same device that does both the "generate" and "transmit" functions based on the antecedent structure of the claims. *See* '468 Patent at Claim 1 (reciting "***the*** controller node comprising" processors to "generate" and a network interface to "transmit" the controller instructions); Dkt. No. 48 at 8. Second, MCM clarified in the Unified Patents IPR that receiving instructions from a human ***or another device*** falls outside the scope of the claimed step of "generating controller instructions" performed by the first processor of the controller node. Dkt. No. 48, Ex. A at 13-14; Dkt. No. 48 at 8-9. Because (1) "***the*** controller node" must do both the "generating" and "transmitting" functions as claimed, and (2) the "generating" function does not

include receiving the instructions from another device, the claimed controller node must be construed as a "single" network device.  *See* Dkt. No. 48 at 7-9.

Of course, the claims may cover systems that include ***multiple*** controller nodes.  *See* Dkt. No. 51 at 14 (citing '468 Patent at 3:43-47).  But MCM's statements in the Unified Patents IPR confirm that there must be a one-to-one mapping of "a controller node" to "a single network device."  *See* Dkt. No. 48 at 7-9.

### 2. *MCM Improperly Imports Limitations from the Specification into its Construction in an Attempt to Preserve Validity of the Claims*

MCM's construction imports limitations such as "network-based router or computer," "within the network," and "remote from the gateway unit" without any lexicography or disclaimer to support limiting the plain meaning of the claimed term.  *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1369 (Fed. Cir. 2012) ("Absent disclaimer or lexicography, the plain meaning of the claim controls.").  MCM's only specification support for its proposed construction states "[t]he ICPs are installed in an ISP's network.  ICPs ***may be*** network-based routers or computers that control the operation of CGs."  *See* Dkt. No. 51 at 13 (citing '468 Patent at 3:43-47) (emphasis added).  This is not lexicography or a disclaimer.  *See Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) ("To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning and must clearly express an intent to redefine the term.") (quotations omitted).  Further, the Federal Circuit has cautioned against confining claims to alternative embodiments.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

MCM's importations also introduce ambiguity and conflict with MCM's own descriptions of the figures and specification. For example, in proposing the construction "network-based router or computer," MCM obscures whether the "network-based" portion of the construction modifies "router" only or also "computer." Dkt. No. 51 at 12-13. MCM's construction is also unclear on what is meant by "within the network," and specifically within which network: such as the service provider network. Constructions that introduce such ambiguities should not be adopted. *In re Packard*, 751 F.3d 1307, 1324 (Fed. Cir. 2014) ("[A]mbiguity in claim constructions should be disapproved.").

Assuming MCM clarifies the network to mean the service provider network, MCM's illustration of Figure 1 of this claim term would then contradict its illustration for service provider network. *Cf.* Dkt. No. 51 at 13 (Figure 1 of '468 Patent) with Dkt. No. 51 at 15 (annotated Figure 1 of '468 Patent).



Dkt. No. 51 at 13



Dkt. No. 51 at 15

If the service provider network is at element 54 as argued by MCM (Dkt. No. 51 at 15), then the controller node (the Internet Control Point 50) is certainly not "within the network."

Given these ambiguities in MCM's attempts to import these limitations, MCM's only reason to offer such a construction appears to be to provide more structure to the claims in view of the abstract idea the Asserted Patents embody. *See* Dkt. No. 34. But the Federal Circuit cautions against allowing parties to re-draft claims under the guise of claim construction to preserve validity under a Section 101 challenge. *Hill-Rom Servs.*, 755 F.3d at 1374 ("Where the meaning of a claim term is clear, as it is here, we do not rewrite the claim to preserve its validity.").

As such, the Court should adopt DISH's construction which properly reflects MCM's prior statements made during IPR proceedings without importing additional limitations from the specification.

**C.    Term 3: "a service provider network" ('468: Claims 1 and 23 / '925: Claims 1 and 29)**

| MCM's Construction | DISH's Construction |
| --- | --- |
| "a network that is operated or controlled by a service provider to provide regulated access to content delivery services for subscribers, but not including subscriber equipment or a subscriber network" | "a network between the controller node and the plurality of gateway units that is not the public Internet and only includes those network elements operated or controlled by the service provider" |

During the Unified Patents IPR, MCM again disclaimed claim scope to overcome prior art. MCM now backpedals away from some of those disclaimers. In particular, MCM's proposed construction for "a service provider network" imports only those prosecution history statements favorable to MCM's interpretation while ignoring the narrower statements from the IPR that prevent them from maintaining infringement claims against DISH. Additionally, MCM's construction imports unnecessary limitations from the specification into the term that fail to make it any easier for a jury to understand. DISH's proposed construction simply holds MCM to the statements made by MCM during the Unified Patents IPR to maintain validity of its claims.

    *1.    MCM's Construction Selectively Imports Only Those Prosecution History Statements Most Favorable to MCM*

MCM argues that DISH's "proposed construction improperly adds an extraneous limitation, i.e., 'only includes those network elements operated or controlled by the service provider.'" Dkt. No. 51 at 16. It does not. The limitation comes directly from an unequivocal disclaimer made by MCM in its POPR. Dkt. No. 48, Ex. A at 6-7. However, MCM's brief inexplicably ignores MCM's own statements that support DISH's construction found on the same page of intrinsic evidence that MCM cites to in support of its construction:

> During the IPR, Mr. Williams testified that the "service provider network" is not the entire public Internet and *only includes those network elements operated or controlled by the service provider*. Further, the service provider *network does not include the subscriber equipment* (e.g., subscriber PC) nor the subscriber LAN located at the subscriber's premises.

*Id.* (citing EX2001, ¶ 47–57) (emphases added). This statement was literally inserted into DISH's construction. MCM cites Mr. Williams's statements to show that "the file history of the '468 Patent supports Plaintiff's constructions." *Id.* at 15. In other words, MCM asks this Court to adopt a portion of Mr. Williams's statements and ignore another portion less than ten lines later. MCM argues that DISH's proposed construction improperly imports limitations into the claims—limitations that are based on the same statements made on the same page by MCM.

MCM cannot cherry pick the portions of the intrinsic record to define the scope of the claims. As DISH explained in its opening brief, statements made by a patent owner during IPR put the public on notice of how the patent owner views its patent. *See Aylus*, 856 F.3d at 1359. MCM provides no reason why this Court should adopt the portions MCM cites while *ignoring MCM's other statements made by the same expert to overcome the same prior art*. The public is entitled to rely on MCM's full statement and interpretation and need not guess which parts would later by claimed by MCM. *See Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011) (explaining that "regardless of whether the examiner agreed with" a patent owner's statements, those "statements still inform the proper construction of the term").

In fact, DISH's proposed construction obviates the need to include the negative limitation proposed by MCM in a manner that is more readable and understandable by a jury. DISH's proposed construction reflects the statements made by MCM in the Unified Patents IPR and entirely subsumes the concept cherry picked by MCM. MCM claims the service provider network does "not include[e] subscriber equipment or a subscriber network." Dkt. No. 51 at 14. However, a network that "only includes those network elements operated or controlled by the service provider" necessarily excludes subscriber equipment and subscriber networks because they are operated and controlled by the subscriber, not the service provider.

     2.     *MCM's Specification Citations do not Clarify what the "Service Provider Network" Is*

MCM also argues that their "proposed construction is supported by, and consistent with, the specification of the '468 Patent." *Id.* In particular, MCM asserts that "the '468 Patent relates 'to regulation of access to a [service provider] network . . . to distribut[e] content efficiently while protecting the digital rights associated with the content.'" *Id.* (quoting '468 Patent at 1:17-20). Likewise, MCM argues that "[t]he service provider delivers content to subscriber terminals, which are located at a subscriber's premises." *Id.* (citing '468 Patent at 1:38-39). The quotations provided by MCM stand for little more than the proposition that the claims relate to methods and systems that regulate access to a service provider network—a fact DISH does not dispute. *See, e.g.*, Dkt. No. 13 (explaining that the Asserted Patents are directed to the abstract idea of "controlling access to content"). However, ***none of the quotations*** relied on by MCM ***explain what a service provider network actually is***. This Court should adopt ***DISH's proposed construction*** because it ***properly reflects what the claimed "service provider network" is***, not how the claimed methods and systems interact with it.

The remainder of MCM's citations support DISH's proposed construction as much, if not

more, than they support MCM's proposed construction.  For example, MCM explains that "[t]he '468 Patent describes a 'service provider network' that is **operated or controlled by a service provider**, such as a cable television provider."  Dkt. No. 51 at 14 (citing '468 Patent at 1:35-38) (emphasis added).  DISH's proposed construction "only includes those network elements **operated or controlled by the service provider**."

      3.      *The Specification and Prosecution History Support DISH's Proposed Construction*

Finally, MCM argues that DISH's proposed construction is "inconsistent with the specification of the '468 Patent" because it "would exclude all . . . commonly-controlled (or shared usage) communication pathways from the definition of 'service provider network.'"  Dkt. No. 51 at 16-17.  MCM asserts that "[i]n common configurations, even privately-controlled networks can use commonly controlled (or shared usage) communication pathways (e.g., towers, cables, switches, etc.) to route communication between and among privately-controlled network elements."  *Id.* at 17.  However, MCM's own statements disclaimed the use of these "commonly-controlled communication pathways."  As discussed in DISH's opening brief, MCM overcame the prior art at issue in the Unified Patents IPR by arguing that the service provider network did not include third-party network elements or any network elements of the public Internet:

> Fig. 1 also illustrates that the ***"service provider network" 54 is distinct from Non-SPA Network Elements 55***.  Collectively, the "service provider network" and Non-SPA Network Elements comprise the Internet/Metro Area Network.  Thus, the "service provider network" is not the entire public Internet and ***only includes those network elements operated or controlled by the service provider***.

Dkt. No. 48 at 16 (quoting Dkt. No. 48, Ex. A at 6 (emphases added)).  These statements by MCM during the IPR proceedings constitute a clear and unambiguous disavowal of claim scope that a service provider network does not cover any type of network, such as those that use "commonly-controlled communication pathways."  *See, e.g.*, *Andersen Corp. v. Fiber Composites, LLC*, 474

13

F.3d 1361, 1374 (Fed. Cir. 2007).

For these reasons, this Court should reject MCM's proposed construction and adopt DISH's proposed construction that is supported by the specification and consistent with the clear and unambiguous statements made during prosecution of the Asserted Patents.

**D.    Term 4: "selectively transmit[ting, by the plurality of gateway units,] the content requests to the service provider network in accordance with the controller instructions" ('468: Claims 1 and 23 / '925: Claims 1 and 29)**

| MCM's Construction | DISH's Construction |
|---|---|
| "a gateway unit, under control of the remotely located controller node, executes previously received controller instructions to determine whether to transmit a content request from a user or to take other action (e.g., deny the content request, redirect the content request, or notify authorities regarding the content request)" | "transmitting all content requests to take place within the service provider network in response to the controller instructions' decision to transmit the content requests" |

The key dispute concerns whether the content requests from the gateway units or network elements must travel over the service provider network or not.  DISH's construction accurately reflects the specification and MCM's admissions in IPR, all of which demonstrate that all content requests must travel over (take place within) the "service provider network."  MCM rewrites this claim to add unsupported elements and structure to the "selectively transmitting" step by construing the term as: "(1) 'a gateway unit'" wherein "(2) the gateway unit is 'under control of the remotely located controller node'" and "(3) [t]he gateway unit 'executes previously received controller instructions to determine whether to transmit a content request from a user or to take other actions' such as denying the content request."  Dkt. No. 51 at 19.  MCM's efforts to import a specialized meaning to this term outside of the ordinary understanding of selectively transmitting should be rejected.

*1.    The Specification and Plain Language of the Claims Supports DISH's Proposed Construction*

The specification explains that the "selectively transmitting" step occurs within the service provider network. Specifically, the specification unequivocally states "**all** ICP-CG **communications** take place **within** the ISP side of the network." '468 Patent at 4:33-34 (emphases added). As explained in DISH's opening brief, because "all" communications take place **within** the service provider network, the specification requires that "content requests" also travel **within** the service provider network. *See The Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1305 (Fed. Cir. 2017) (explaining that claim construction requires a process described in the specification when the specification states that the "process includes all of the embodiments as described").

DISH's construction similarly tracks the alleged purpose of the invention as a whole. The background of the Asserted Patents discusses that "Service providers and content providers need the assurance that the [content] will be secure from illegal downloading and transmission over the Internet." '468 Patent at 1:60-64. The specification confirms that it is "therefore desirable to provide new access regulation and data traffic control techniques that can be made available to telephone line carriers, ISPs, enterprises, cable television companies, for **their** Internet access networks." *Id.* at 2:21-24 (emphasis added). The specification discusses meeting "these needs using the service provider's **existing distribution network**." *Id.* at 2:27-29 (emphasis added). The alleged invention thus specifically contemplates limiting the communications over the service provider network. Traveling "within" the service provider network permits the system to regulate access to the network. If content requests could travel outside of the service provider network, none of the control contemplated by the alleged invention could be accomplished.

MCM wrongly argues that DISH's proposed construction reads out the "selective" part of the claim. DISH's construction includes that the transmission takes place "in response to the controller instructions." *See* Dkt. No. 48 at 17. However, the controller instructions determine

whether or not to transmit the content requests as explained in Section I.A above. Thus, the "selectively" portion of the claim is properly encompassed within the "controller instructions" portion of DISH's proposed construction.

        2.    *MCM's Construction Improperly Includes Structural Limitations Found Elsewhere in the Claims*

MCM provides no explanation for why the functional "selectively transmitting" term should be construed to include a structural "gateway unit" limitation. Similarly, MCM fails to explain why "selectively transmitting" requires "the remotely located controller node" to control the gateway units. MCM argues that "selectively transmitting" requires a gateway unit "under control of the remotely located controller node" because the specification explains "the gateway unit performs functions such as conditional denial in response to controller instructions from the remotely-located controller node." Dkt. No. 51 at 19 (citing '468 Patent at FIG. 1, 7:54-65, 7:53-8:18). MCM's argument fails, however, because it is not commensurate with the claim language itself. The plain language of the claims requires only that the gateway units perform the "selectively transmitting" step "in accordance with the controller instructions." *See, e.g.*, '468 Patent at Claim 23.

Even if the claimed gateway unit must be "under control of the remotely located controller node," MCM fails to explain why this Court should include that limitation in the "selectively transmitting" term. Tellingly, MCM includes this same limitation in its proposed construction for the "gateway units" and "network elements" terms. *See* Dkt. No. 51 at 20, 27-28. MCM's litigation-fueled claim constructions shoehorn this limitation into the "selectively transmitting" term as well as the "gateway units" and "network elements" terms to maximize the chances that this Court includes it in the claims. DISH disputes that the claims require this limitation at all (*see infra* at I.E), and it certainly does not belong in the "selectively transmitting" term.

3.      *MCM's Construction Adds Confusing and Unnecessary Limitations*

The remainder of MCM's construction improperly imports limitations into the claims that are either not properly part of the claims at all or found in other claim elements.  *See Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").  For example, MCM's requirement that the gateway unit "'executes previously received controller instructions to determine whether to transmit a content request from a user or to take other actions such as denying the content request" includes unnecessary and unsupported limitations.  As discussed in DISH's opening brief and above at Section I.A, this determination belongs in the "[to generate / generating] controller instructions" step construed by DISH as "to create[ing] or bring[ing] into being computer executable instructions *that determine whether to transmit or not transmit a content request from a user to the service provider network*."  *See* Dkt. No. 48 at 3-6; *supra* at I.A.

The claimed executable "controller instructions" "determine whether to transmit or not transmit a content request."  Thus, that determination should be tied to that term.  Further, MCM provides no reason why the optional examples included as "other actions" should be included in the construction of this term.  *See, e.g.*, *In re Johnston*, 435 F.3d 1381, 1384 (Fed. Cir. 2006) ("As a matter of linguistic precision, optional elements do not narrow the claim because they can always be omitted.").

For these reasons, this Court should reject MCM's proposed construction and adopt DISH's proposed construction that properly reflects the intrinsic record without importing unnecessary limitations into the claims.

### E.    Term 5: "gateway units" ('468 Patent: Claims 1 and 23)

| MCM's Construction | DISH's Construction |
| --- | --- |
| "a computer device that is located within a subscriber premise, remote from the controller node, that is under control of the controller node, and that is usable by a subscriber to perform certain functionality only as permitted by the controller node" | "computer devices that are remote from the controller node and interface with the service provider network and a subscriber terminal" |

Though both parties agree that "gateway units" are located "remote from the controller node," DISH disputes that they must be "located within a subscriber premise." The remaining portion of MCM's construction unnecessarily repeats elements found elsewhere in the claim.

Failing to cite any intrinsic support for its narrowing limitations, MCM proposes that the gateway units be "located within a subscriber premise." MCM generally references that "the gateway units described in the '468 Patent are tamper-proof, such that subscribers cannot access the device's hardware or software." Dkt. No. 51 at 21. MCM then cites numerous references in the specification as to the "tamper-proof" aspect of the "gateway units." *See id.* at 21-22. But the obvious fact that a gateway unit may be "tamper-proof" does not somehow *require* that a gateway unit should be construed with a specific physical location, i.e., "within a subscriber premise." Indeed, dependent claim 8 already includes a limitation to address the tamper-proof capability for the "gateway units," reciting "wherein each of the gateway units further comprises . . . a housing . . . [and] a detector configured to detect an attempt to open the housing." '468 Patent at Claim 8. A common claim construction principle forbids reading dependent claim limitations into the independent claim. *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1324 (Fed. Cir. 2012) ("The doctrine of claim differentiation is at its strongest in this type of case, where the limitation that is sought to be read into an independent claim already appears in a dependent claim.") (quotations omitted).

The only other support MCM points to concerns a declaration by MCM's prior IPR expert stating that a "gateway unit" should "exclude a device in which the subscriber (e.g., an end user) has access to the device's hardware or software." Dkt. No. 51 at 22. This citation provides no reason to import the "located within a subscriber premise" limitation as MCM proposes to do. Indeed, MCM provides no reason why, and DISH is not aware of any reason why, a "gateway unit" could not be *both* "tamper-proof" and located outside of a subscriber premise. In fact, the reason the claimed concept of having a "tamper-proof" device as provided in the dependent claims was because the gateway unit *could* be located in a subscriber premises. '468 Patent at 3:59-61 ("The ICPs cooperate with hardware and software of the CGs located at a subscriber's premises to provide the specific features of the system."). MCM's proposed importation of a specific location for the gateway units has no intrinsic support and improperly narrows the claims in a hindsight effort to preserve validity.

MCM further argues that "[a]ny proper construction of gateway unit must include the element of being *controlled by the controller node* in order to provide the security features described in the '468 Patent." Dkt. No. 51 at 23 (emphasis added). Both DISH's and MCM's construction of "a controller node" includes "control[ling] the operation of the gateway units," and thus, that limitation is redundant and unnecessary here. MCM's inclusion of this same limitation with respect to multiple claim terms is telling of its attempt to import as many additional limitations into the claims as possible to preserve validity.

Thus, the Court should reject MCM's unsupported, narrow construction and adopt DISH's construction which properly encompasses a broad range of computer devices without importing unnecessary limitations.

F.    **Term 6: "network elements" ('925: Claims 1 and 29)**

| MCM's Construction | DISH's Construction |
|---|---|
| "a computer device that is located remote from the controller node, that is under control of the controller node, and that is usable by a subscriber to perform certain functionality only as permitted by the controller node" | "computer devices within the service provider network" |

MCM proposes to depart from the ordinary meaning of "network elements" to construe this term narrowly to include unnecessary features such as its location being "remote from the controller node" and other elements not required by the specification. DISH, in contrast, proposes a construction that reflects the ordinary understanding of "network elements" — computer devices within the service provider network. MCM suggests that DISH's "proposed construction is unreasonably broad in view of the '925 Patent specification." Dkt. No. 51 at 29. However, MCM provides no support for why this Court should adopt an overly narrow interpretation that departs from the ordinary meaning of the term. *See id.* at 27-29.

MCM's relies on Figure 1 to suggest that this Court should import the "located remote from the controller node" feature into the construction of network elements. MCM claims that Figure 1 of the '925 Patent "illustrates 'SPA Network Elements' 54 and 'Non-SPA Network Elements' 55 as located within 'Internet/Metro Area Network 52' and remote from 'Internet Control Point' 50 (i.e., a controller node)." *Id.* at 28. However, at most, Figure 1 of the '925 Patent shows that the network elements are coupled to "Internet Control Point" 50. Nothing in Figure 1 or the accompanying text in the specification requires that the network elements must be "located remote from the controller node."

Further, MCM's proposed construction improperly combines the "gateway units" and "network elements" terms. The Federal Circuit repeatedly rejects constructions that fail to distinguish between distinct claim elements. *CAE Screenplates Inc. v. Heinrich Fiedler GmbH &*

*Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings.").

As discussed in DISH's opening brief, the specification supports DISH's broader construction of the "network elements" term. Dkt. No. 48 at 22-23. The specification explains "[n]etwork elements 54, 55 may include, for example, network switches and routers. SPA-controlled network elements 54 aid in regulating access and distributing content through network 52." '925 Patent at 5:11-14. Similarly, the specification states "SPA-controlled network elements 54 may include one or more network interfaces 300, one or more processors 302, a memory device 304 including a database, and one or more switch modules 306 for providing routing and switching services." *Id.* at 7:27-31.

Accordingly, this Court should reject MCM's proposed construction and adopt DISH's proposed construction of "network elements" as encompassing broad categories of computer devices.

## II.    CONSTRUCTION OF DEPENDENT CLAIM TERMS

The parties dispute as to the dependent claims is a simple one—DISH proposes the plain and ordinary meaning while MCM repeatedly attempts to import limitations that change that plain and ordinary meaning. MCM proposes constructions for six dependent claims terms without explaining how any of these proposed constructions aid a jury in understanding the ordinary terms or otherwise simplify any definition of those terms. Dkt. No. 51 at 25-27, 29-30. This Court should not adopt MCM's proposed constructions for these dependent claim terms because they import limitations that are, at best, found only in preferred embodiments of the specification, and at worst, are not found anywhere in the specification and inconsistent with the plain and ordinary language of the claims.

Claim terms "are generally given their ordinary and customary meaning," which "is the

meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312-13. Under *Phillips*, deviation from the plain-and-ordinary-meaning rule must be supported by evidence in the intrinsic record that the patentee intended to give the term a different meaning than would be understood in the art at the time of the invention. *Id.* at 1326. Stated affirmatively, "it is improper to import a limitation into a claim where the limitation has no basis in the intrinsic record." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1376 (Fed. Cir. 2005). Again and again, the Asserted Patents merely used terms in their ordinary sense without further lexicography or disclaimer.

As discussed in DISH's opening brief, MCM's proposed constructions depart from the plain and ordinary meaning of these dependent claim terms. *See* Dkt. No. 48 at 23-30. MCM's proposed constructions must be rejected because MCM provides no prosecution history, disclaimer, or lexicography to suggest that the Applicant intended these easily understood terms to have a specialized meaning. *See DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1347 (Fed. Cir. 2008) ("absent contravening evidence from the specification or prosecution history, plain and unambiguous claim language controls the construction analysis") (citing *Northern Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1295 (Fed. Cir. 2000) ("The plain and ordinary meaning of claim language controls, unless that meaning renders the claim unclear or is overcome by a special definition that appears in the intrinsic record with reasonable clarity and precision.") (citation omitted)). MCM's limited reliance on non-limiting examples from the specification is misplaced as, at best, those examples are preferred embodiments that should not be imported into the claims. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1370 (Fed. Cir. 2003) (explaining that claims are not "ordinarily limited in scope to the preferred embodiment").

MCM presents no argument that insertion of these additional limitations into the claims makes the terms easier for a jury to understand.  In fact, for each of these dependent claim terms, MCM's opening brief provides no explanation for why this Court should deviate from the plain and ordinary meaning other than "Plaintiff's proposed construction is consistent with the specification."  *See* Dkt. No. 51 at 25-27, 29-30.  However, this Court should not adopt MCM's proposed constructions that are merely "consistent with the specification" but otherwise fail to aid the Court or jury in understanding terms.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (explaining that courts use claim construction to "determin[e] the meaning and scope of the patent claims asserted to be infringed")

Instead, MCM's proposed constructions appear to import extraneous limitations into the claims hoping that those limitations will save the claims from future validity challenges.  MCM's litigation gamesmanship should be rejected because "[w]here the meaning of a claim term is clear, as it is here, we do not rewrite the claim to preserve its validity."  *Hill-Rom Servs.*, 755 F.3d at 1374.  As the Federal Circuit explained, this Court "should be cautious not to allow claim construction to morph into a mini-trial on validity."  *Id.*

As mandated by *Phillips*, MCM's constructions for the following dependent terms should be rejected in favor of the plain and ordinary meaning.  As shown in detail below, MCM's specification citations provides insufficient reason to include these extraneous, litigation-fueled limitations.

### A.    Term 1: "if the gateway unit enters the inactive state" ('468: Claim 29)

| MCM's Construction | DISH's Construction |
|---|---|
| "within a reasonable time before or after the gateway unit enters the inactive state" | Plain and ordinary meaning |

MCM provides no reason that a jury would not understand the plain and ordinary language

of the term "inactive."  For that reason alone, this Court should reject MCM's proposed construction.  MCM's proposed construction must also be rejected because it seeks to import limitations into this term that are not supported by the specification.  MCM appears to be construing "if" as "within a reasonable time before or after."  However, MCM explains that "[t]he *'468 Patent is agnostic on the temporal relationship* between when the gateway unit enters the inactive state and when the gateway unit notifies the controller node that the gateway unit has entered the inactive state."  Dkt. No. 51 at 26 (emphasis added).  MCM then concludes that "***any attempt to read in a temporal relationship*** between the gateway unit entering the inactive state and the gateway unit notifying the controller node ***would be inconsistent with the specification*** of the '468 Patent."  *Id.* (emphases added).  However, as DISH previously explained, only MCM attempts to improperly read a temporal limitation into the term "inactive."  *See also* Dkt. No. 48 at 25 ("MCM's temporal requirement rewrites the dependent claim from its originally intended meaning into a completely different claim with different scope.").  Thus, MCM itself acknowledges that its own proposed construction is unsupported by the specification and must be rejected.

### B.    Term 2: "registration information" ('468: Claim 33)

| MCM's Construction | DISH's Construction |
|---|---|
| "information that associates a gateway unit with a controller node" | Plain and ordinary meaning |

MCM does not refute DISH's assertion that both "registration" and "information" can be easily understood by a jury and have a plain meaning.  *See* Dkt. No. 48 at 27.  Instead, MCM quotes a single passage of the specification as demanding that this Court adopt MCM's proposed construction:

> The ***registration process may include collection of information*** by ICP 50 for a warranty registration from the subscriber such as, for example, CG's 58 hardware address and other identifying data. ICP 50 will then send CG 58 the latest operating

software, if necessary, and its initial operating parameters to load in memory 104.

'468 Patent at 7:20-33 (emphasis added); *see also* Dkt. No. 51 at 26.  However, MCM fails to explain why this portion of the specification requires limiting "registration information" to "information that associates a gateway unit with a controller node."  The cited "registration process" that "may include collection of information" makes no reference to any "associat[ion] of a gateway unit and a controller node."  In fact, MCM provides no citation that discusses information—registration or otherwise—that associates a gateway unit and a controller node.  Thus, MCM's proposed construction must be rejected because it seeks to transform the claimed "registration information" into something very different from what the claims and intrinsic record support to preserve validity of the claim.  *See Hill-Rom Servs.*, 755 F.3d at 1374.

### C.    Term 3: "uniquely" ('468: Claim 24)

| MCM's Construction | DISH's Construction |
|---|---|
| "possessing, within a network, a characteristic of a device that is not shared by other devices within the network" | Plain and ordinary meaning |

Although the specification uses "unique" several times, MCM provides no indication that the specification intended to depart from the plain and ordinary meaning of "uniquely."  MCM argues that "'unique,' in the context of the '468 Patent, should be understood as unique *within the network* (as opposed to globally unique)."  Dkt. No. 51 at 27 (emphasis in original).  As support, MCM cites a single portion of the specification that uses "unique:"

> The IP address and other unique identifying information about which CG 58 holds which portion of content is tracked by SPA-controlled content server 56 and ICP 50.

'468 Patent at 13:39-42.  Tellingly, this portion of the specification does not mention a "network" at all, much less that the "unique identifying information" must be identifying information "not shared by other devices *within the network*" as MCM alleges.  Accordingly, this Court should

reject MCM's proposed construction because MCM fails to provide any reason to depart from the plain and ordinary meaning of the term and simply imports the "within the network" limitation in an otherwise ordinary term.

### D.    Term 4: "initial operating parameters" ('468: Claim 33)

| MCM's Construction | DISH's Construction |
|---|---|
| "one or more variables associated with an operating mode first entered into by a gateway unit after registration" | Plain and ordinary meaning |

MCM's construction of "initial" departs from the plain meaning and imports unsupported limitations.  MCM's single citation to the specification does not support its assertion that "'initial,' in the context of the '468 Patent, should be understood as "first entered into by a gateway unit after registration."  Dkt. No. 51 at 27.  The relevant portions of the '468 Patent specification state that "initial operating parameters [are] load[ed] in memory 104."  '468 Patent at 7:27-29; *see also*, *id.* at 6:30-32.  Further, the specification states "[i]nitial operating parameters may include, for example, the address of the CG's 58 ICP 50 and other variables as described below."  *Id.* at 7:29-31.  There is no basis or need for translating "operating parameters" to "one or more variables associated with an operating mode."  The plain and ordinary meaning of "operating parameters" conveys the same meaning without importing language that will only confuse the jury.

Nor is there any support for MCM to restrict "initial" to the specific temporal requirement of "first entered into after registration."  The specification of the '468 Patent states that "CGs *may be* required to register with ICP 50 when they are powered up for the first time."  '468 Patent at 7:20-21 (emphasis added).  Thus, MCM's construction requires a limitation ("after registration") that only *might* occur.  The Court should not allow MCM to import embodiments from the specification and should adopt the plain and ordinary meaning of the term.

### E.    Term 5: "subscriber management system" ('925: Claim 25)

| MCM's Construction | DISH's Construction |
|---|---|
| "a system that manages subscriber devices of a service provider network, the subscriber management system being part of the service provider network" | Plain and ordinary meaning |

The '925 Patent specification does not support the imported limitations "of a service provider network" and "being part of the service provider network." The first portion of the '925 Patent MCM relies upon states that "SPA-controlled network element 54 may be provided in various forms, such as, for example . . . a subscriber management system used to control access to *the network*, authenticate subscribers or devices before allowing access into *the network*." '925 Patent at 7:33-38 (emphases added). The other portion of the '925 Patent that mentions the "subscriber management system" states:

> After ICP 50 has authorized the flow of data through a CG 58, ICP 50 may send authorization instructions to access node 66 associated with the ISP providing ISP portal 62. ***Access node 66 may be, for example, an internet access server or subscriber management system.*** The authorization instructions must be received by access node 66 before the subscriber may be authenticated and granted internet access.

*Id.* at 10:15-21 (emphasis added). Neither of these references specify a "service provider network" as MCM asserts. Thus, the Court should reject these imported limitations and adopt the plain and ordinary meaning of the term.

### F.    Term 6: "authenticate subscribers or devices before allowing access into the service provider network" ('925: Claim 25)

| MCM's Construction | DISH's Construction |
|---|---|
| "identifying subscribers or devices that are allowed to access a requested service provided by the service provider network" | Plain and ordinary meaning |

MCM's proposed construction complicates the claim language and is unsupported by the specification. None of the citations to the '925 Patent specification MCM relies upon support the

additional limitations of "identifying" and "a requested service provided by" the service provider network. *See* Dkt. No. 51 at 30. As stated in DISH's opening brief, the phrase "requested service" does not appear in the specification and has no basis for being included in the construction. Additionally, MCM's proposed construction reads out the temporal requirement of "***before*** allowing access" from the claim term, and is thus, inconsistent with the claims themselves. *Phillips*, 415 F.3d at 1314 ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."). MCM offers no reason why the Court should depart from the plain and ordinary meaning of this claim term.

## III.    CONCLUSION

For these reasons, DISH respectfully requests the Court construe the disputed claim terms in accordance with DISH's proposed constructions.

Dated:  April 5, 2019

Respectfully submitted,

_Ali Dhanani_____
G. Hopkins Guy, III (*pro hac vice*)
BAKER BOTTS L.L.P.
1001 Page Mill Road,
Building One, Suite 200
Palo Alto, CA 94304
Tel.: (650) 739-7500
Fax: (650) 739-7699
hop.guy@bakerbotts.com

Ali Dhanani (*pro hac vice*)
Texas State Bar No. 24055400
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, TX 77002
Tel.: (713) 229-1108
Fax: (713) 229-2808
ali.dhanani@bakerbotts.com

Kurt Pankratz (*pro hac vice*)
Texas State Bar No. 24013291
BAKER BOTTS L.L.P.
2001 Ross Ave., Suite 900
Dallas, TX 75201
Tel.: (214) 953-6584
Fax: (214) 661-4584
kurt.pankratz@bakerbotts.com

John P. Palmer
State Bar No. 15430600
NAMAN, HOWELL, SMITH & LEE,
PLLC
400 Austin Ave., Suite 800
P.O. Box 1470
Waco, Texas 76703
Tel: (254) 755-4100
Fax: (254) 754-6331
palmer@namanhowell.com

**Attorneys for Defendant DISH Network L.L.C.**

## **CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via electronic mail on April 5, 2019.

*/s/ Ali Dhanani*