# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# WACO DIVISION

| | | |
|---|---|---|
| MULTIMEDIA CONTENT MANAGEMENT LLC, Plaintiff | § § § § | Civil Action No.: 6:18-cv-00207-ADA |
| v. | § § § | JURY TRIAL DEMANDED |
| DISH NETWORK L.L.C., Defendant. | § § § § | PATENT CASE |

## DEFENDANT'S REPLY CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**

I.   CONSTRUCTION OF INDEPENDENT CLAIM TERMS .............................................. 1

    A.   Term 1: "to generate controller instructions" ('468: Claim 1 / '925: Claim 1) or "generating controller instructions" ('468: Claim 23 / '925: Claim 29) ........................ 1

    B.   Term 2: "a controller node" ('468: Claims 1 and 23 / '925: Claims 1 and 29) ............ 3

    C.   Term 3: "a service provider network" ('468: Claims 1 and 23 / '925: Claims 1 and 29) ............................................................................................................................. 5

    D.   Term 4: "selectively transmit[ting, by the plurality of gateway units,] the content requests to the service provider network in accordance with the controller instructions" ('468: Claims 1 and 23 / '925: Claims 1 and 29).................... 9

    E.   Term 5: "gateway units" ('468 Patent: Claims 1 and 23) .......................................... 11

    F.   Term 6: "network elements" ('925: Claims 1 and 29) ............................................... 12

II.  CONSTRUCTION OF DEPENDENT CLAIM TERMS ................................................ 13

    A.   Term 7: "if the gateway unit enters the inactive state" ('468: Claim 29) ................... 14

    B.   Term 8: "registration information" ('468: Claim 33) ................................................ 14

    C.   Term 9: "uniquely" ('468: Claim 24) ......................................................................... 14

    D.   Term 10: "initial operating parameters" ('468: Claim 33) ......................................... 15

    E.   Term 11: "subscriber management system" ('925: Claim 25) ................................... 15

    F.   Term 12: "authenticate subscribers or devices before allowing access into the service provider network" ('925: Claim 25) .............................................................. 15

III. DISH'S EXPERT DECLARATION ................................................................................ 15

IV.  CONCLUSION .................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ACTV, Inc. v. Walt Disney Co.*,
   346 F.3d 1082 (Fed. Cir. 2003)......................................................................................9

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
   637 F.3d 1324 (Fed. Cir. 2011)..................................................................................4, 8

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*,
   224 F.3d 1308 (Fed. Cir. 2000)..............................................................................11, 12

*Phillips v. AWH Corp*,
   415 F.3d 1303 (Fed. Cir. 2005)....................................................................................13

*Regeneron Pharm., Inc. v. Merus N.V.*,
   864 F.3d 1343 (Fed. Cir. 2017)......................................................................................2

*The Medicines Co. v. Mylan, Inc.*,
   853 F.3d 1296 (Fed. Cir. 2017)......................................................................................9

MCM has now abandoned its positions with respect to half of the independent claim terms. While MCM states that the amendments are to "simplify claim construction issues," the amendments were necessitated by MCM's original unsupportable constructions. However, MCM's amended constructions do not fully remedy the deficiencies of the original constructions. DISH's constructions reflect the plain and ordinary understanding of the terms, an understanding that MCM's own expert acknowledges now is correct. As reflected below, few actual disputes exist in light of the admissions by MCM's expert.

## I.    CONSTRUCTION OF INDEPENDENT CLAIM TERMS

### A.    Term 1: "to generate controller instructions" ('468: Claim 1 / '925: Claim 1) or "generating controller instructions" ('468: Claim 23 / '925: Claim 29)

| MCM's Amended Construction | DISH's Construction |
|---|---|
| "generate computer processor-executable instructions, excluding merely a uniform resource locator (URL) or an internet protocol (IP) address, excluding operations in which the controller instructions are only transmitted or are relayed by a device" | "to create[ing] or bring[ing] into being computer executable instructions that determine whether to transmit or not transmit a content request from a user to the service provider network" |

MCM's amended construction adds a second negative limitation yet still fails to define what "controller instructions" are or how they are "generated" in context of the claims. DISH's construction affirmatively construes "generate" without importing negative limitations while MCM continues to use the term "generate" to define itself.

DISH's construction of "generate" as "to create or bring into being" reflects the ordinary meaning of the term in the context of the Asserted Patents to a person of ordinary skill in the art. The term "generate" refers to something that did not exist prior to the generation. MCM used this same understanding in its response to the Unified Patents IPR. *See* Dkt. No. 48 at 4 (quoting Ex. A at 13 ("the generated item did not exist prior to being generated")). Indeed, MCM provides no reason why "create or bring into being," words Applicant used in the Patent Owner Preliminary

1

Response ("POPR") of the Unified Patents IPR, would be an inappropriate construction of the term "generate." *See* Dkt. No. 53 at 4-7. MCM's own expert entirely concedes the issue: "but in the context of 'controller instruction,' what does 'generate' mean? A: I thought I was clear. Bringing – you know, ***create something that didn't exist before***. To – Q: And would you say it means to create or bring into existence? A: Yes." Ex. M, 4-12-19 Transcript of J. Williams at 42:6-13; *see also id*. at 47:8-22. Indeed, MCM's expert confirmed the necessity to interpret this term as part of his validity analysis before the PTAB: "And it was critical in the context of controller instructions that you interpret what the term 'generate' actually meant; is that correct? A: Yeah, I agree." *Id*. at 40:9-12. Despite this concession, MCM does not interpret "generate" in its proposed construction.

Instead of providing a construction that explains what "controller instructions" actually are, MCM seeks to define the term "controller instructions" by what they are not. MCM only argues that controller instructions exclude "merely a uniform resource locator (URL) or an internet protocol (IP) address." Negatively construing the claim based on what the claim does not cover is not proper claim construction. *See Regeneron Pharm., Inc. v. Merus N.V.*, 864 F.3d 1343, 1352 (Fed. Cir. 2017) ("Because 'comprise' is inclusive or open-ended, the use of the term does not exclude unrecited elements.").

Controller instructions determine whether or not to transmit a content request in the context of the claims. MCM's own expert confirms this understanding. Ex. M at 49:13-18 ("Is it your understanding that in the context of Claim 1, that the controller instructions in that case were to determine whether to transmit or not transmit a content request? A: Generally, I would say yes.") (objections omitted). MCM's argument that the specification supports that "controller instructions" do more than "determine whether or not to transmit content requests" is wrong. *See*

Dkt. No. 53 at 5-6 (citing '468 Patent, 7:53-8:18, 10:31-39). MCM's citations do not concern or even mention "controller instructions" when discussing the purported functions of "redirect[ing] a content request" or "notify[ing] authorities regarding a content request." Tellingly, the only reference to "controller instructions" in those citations concerns the function of "selectively transmit[ting] the network access requests over the network *in accordance with the controller instructions*." '468 Patent at 7:55-61 (emphasis added). DISH's construction therefore correctly defines the phrase "generate controller instructions" by affirmatively construing "generate" in the context of the instructions to be created.

The dependent claims identified by MCM in fact support that the "controller instructions" *must* "determine whether to transmit or not transmit a content request." The dependent claims provide additional, optional functions that the "controller instructions" *may* perform if the determination is made not to transmit a content request (by either instructing a gateway unit to redirect a content request or notify authorities regarding a content request). *See* '468 Patent at 7:53-8:18, 10:31-39. In both of those scenarios, the controller instructions must have determined that the content requests should either be transmitted or not transmitted (and redirect those content requests or notify authorities). Thus, DISH's construction is also consistent with the dependent claims.

B.  Term 2: "a controller node" ('468: Claims 1 and 23 / '925: Claims 1 and 29)

| MCM's Construction | DISH's Construction |
|---|---|
| "a network-based router or computer located within the network and remote from the [gateway unit / network element] and that controls the operation of one or more [gateway units / network elements]" | "a single network device that controls the operation of the gateway units" |

The remaining key dispute between the parties' construction concerns whether a "controller node" must be a "single network device" as DISH proposes or "any number of

3

devices . . . combined to 'generate' the controller instructions and 'transmit' the controller instructions" as MCM proposes. *See* Dkt. No. 53 at 9. Based on MCM's concessions in the Unified Patents IPR and the plain language of the claims, MCM limited "a controller node" to a single device.

No intrinsic support shows "a controller node" as multiple devices. Nor has MCM cited any such support. MCM attempts to suggest that "[t]he '468 Patent describes a controller node as including multiple components, some of which may generate controller instructions, and some of which may transmit the controller instructions." Dkt. No. 53 at 8. "Multiple components" does not mean "multiple devices"; however, MCM's response briefly attempts to revise the meaning of statements that MCM made during IPR. MCM now contends that "[t]he term 'another device,' as used in the context of the IPR, only distinguishes the device from something that is ***not the controller node.***" Dkt. No. 53 at 8 (emphasis in original). As explanation, MCM only offers that it would be understood "in the context of the IPR." *Id.* That is no justification for reinterpreting MCM's concession. MCM made public statements to overcome prior art, and the public must be allowed to rely on the reasonable interpretation of those statements to determine claim scope. *See Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011). MCM's own expert now agrees that those public statements confirm that the controller node is a single network device: "In the context of the claim, is it your understanding that the controller node is the node, the single node that generated the controller instruction? A: Yes." Ex. M at 77:17-21; *see also id.* at 76:23-77:8 (citing to Mr. Williams's statements in his IPR declaration). MCM's expert's unequivocal answer should resolve any remaining dispute that DISH's construction is correct.

MCM's proposed construction also reads out the commonly understood meaning of a "node." If "a controller node" can be any number of distributed devices over a network—as MCM

4

apparently contends—the word "node" would have no meaning. The specification of the '468 Patent supports DISH's construction of a "single" device by equating a "controller node" to an "Internet Control *Point*." *See, e.g.*, '468 Patent at 3:43-46 (emphasis added); *see also id.* at 4:55-57; Fig. 3. However, MCM's construction would allow any number of devices located at any number of locations (or "points") in the network to be construed as "a controller node." Such a construction contradicts the plain meaning of the word "node." *See* Dkt. No. 48 at 9.

For the same reasons discussed in DISH's opening and responsive briefs, the "network-based router or computer" limitation is extraneous and should not read into the claims. Thus, the Court should adopt DISH's construction as properly reflecting the intrinsic record.

### C. Term 3: "a service provider network" ('468: Claims 1 and 23 / '925: Claims 1 and 29)

| MCM's Amended Construction | DISH's Construction |
|---|---|
| "a network that is operated or controlled by a service provider to provide regulated access to content delivery services for subscribers, but not including subscriber equipment or a subscriber network <u>or the entire public internet</u>" | "a network between the controller node and the plurality of gateway units that is not the public Internet and only includes those network elements operated or controlled by the service provider" |

The parties' dispute regarding "service provider network" centers on whether that network can include any portion of the "public internet" not owned, controlled, or operated by the service provider. In its responsive brief, MCM proposed an amended construction that relies on portions of a public disclaimer that MCM made during the Unified Patents IPR. However, the cherry-picked portions of that disclaimer adopted by MCM do not properly give effect to the clear, unambiguous statements that MCM made to avoid institution of the IPR before the Patent Trial and Appeal Board ("PTAB"). Only DISH's construction holds MCM to the full extent of the concession made during the prior IPR to overcome prior art that the service provider network "only includes those network elements operated or controlled by the service provider." Dkt. No. 48,

5

Ex. A at 6.

MCM's amended construction explains that the "service provider network" does not include "subscriber equipment or a subscriber network <u>or the entire public internet</u>." Dkt. No. 53 at 9 (emphasis in original to show amendment). MCM's new proposal provides no additional guidance as to what the "service provider network" is. A plain language interpretation of MCM's revised construction suggests that if a network does not include the entire public internet, it would fall within MCM's construction of "service provider network." Taking this understanding to its logical conclusion, so long as a network excluded at least one public router, switch, or server, it would fall within MCM's construction. No network uses every part of the public Internet. Thus, MCM's construction still fails because it does not reflect the clear, unambiguous disclaimers made during prosecution and in the Unified Patents IPR.

During prosecution and in the Unified Patents IPR, the Applicant and MCM repeatedly characterized the service provider network as a network that "***only includes those network elements operated or controlled by the service provider***." Applicant provided this understanding during prosecution of the parent '128 Patent in response to an Examiner's anticipation rejection by U.S. Patent No. 6,516,416 to Gregg *et al.* ("Gregg"). *See* Dkt. No. 48, Ex. F at 2. Applicant argued that the system of Gregg did not disclose the amended claims because the alleged "controller node" and "gateway units" were separated by a local area network, not a service provider network as claimed. Dkt. No. 48, Ex. H at 32-33. Applicant's statement regarding the scope of a claim limitation in related patents "applies with equal force to subsequently issued patents that contain the same claim limitation." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999).

During the Unified Patents IPR, MCM expanded the scope of the disclaimer for the

"service provider network." Like Gregg, the prior art in the Unified Patents IPR—U.S. Patent No. 5,987,611 to Freund ("Freund")—involved a conditional access server that communicated with a client via a local area network behind a firewall. Dkt. No. 48, Ex. I at Fig. 3A. To distinguish the claimed system of the '468 Patent from the system disclosed by Freund, MCM argued that the service provider network did not include any third-party network elements or any network elements of the public Internet:

> Fig. 1 also illustrates that the "service provider network" 54 is distinct from Non-SPA Network Elements 55. Collectively, the "service provider network" and Non-SPA Network Elements comprise the Internet/Metro Area Network. Thus, the "service provider network" is not the entire public Internet and ***only includes those network elements operated or controlled by the service provider***.

Dkt. No. 48, Ex. A at 6 (emphasis added). DISH's proposed construction merely imports this language verbatim to capture the full disavowal of claim scope made by MCM because it excludes "those network elements operated or controlled by the service provider." Thus, DISH's proposed construction is proper.

MCM's own expert confirmed this understanding during deposition regarding his declaration. When asked, whether "'service provider network' only includes those network elements operated or controlled by the service provider," he responded unequivocally, "[c]orrect." Ex. M at 51:17-22. Mr. Williams confirmed that this interpretation is supported by the specification and the understanding of a person of ordinary skill in the art. *Id*. at 52:7-14. Specifically, Mr. Williams confirmed that the IPR statements support the interpretation that the service provider network is not the public Internet and only includes those network elements operated or controlled by the service provider as proposed in DISH's construction.

> Q: Now, in your statement that a person of ordinary skill in the art would not understand the entire public Internet to be claimed as the service provider network, it's your understanding that some portion of the Internet might be part of the service provider network, provided those network elements were either owned, operated, or controlled by the provider; correct?

7

>    A. Yes. I agree.
>
>    Q. And if they're not owned, operated, or controlled by the service provider, then they're not part of the 'service provider network,' as you understand the term to mean in the context of Claim 1; correct?
>
>    A. That's correct.

*Id*. at 53:11-25.  To the extent any question remained regarding the interpretation of these statements, MCM's expert resolved those differences in favor of DISH's proposed construction.

MCM argues that DISH's proposal of excluding the word "entire" in its construction "tak[es] an unsupported, illogical leap."  Dkt. No. 53 at 10.  But MCM's argument relies on the wrong part of the statements that Mr. Williams made in the Unified Patents IPR.  DISH's proposed construction excludes the word "entire" because a network that "only includes those network elements operated or controlled by the service provider" forecloses the use of any portion of the "public Internet."  Thus, DISH's proposed construction reflects MCM's public statements regarding the claim scope.

Similarly, MCM relies on an annotated version of Figure 1 that, it argues, demonstrates that the service provider network is "located within the Internet."  Dkt. No. 53 at 10.  MCM's argument misses the point.  DISH's construction is that the "service provider network" cannot be the public Internet, and "only includes those network elements operated or controlled by the service provider" as MCM argued to the PTAB.  DISH's construction still would allow a service provider network located within the Internet, so long as the devices creating the service provider network all were operated or controlled by the service provider network.  Thus, MCM's argument fails in view of the disclaimers that MCM made to define the service provider network during prosecution.  DISH's proposed construction must be adopted because the public is entitled to rely on MCM's full statement and interpretation and need not guess which parts would later be re-claimed by MCM.  *See Am. Piledriving Equip.*, 637 F.3d at 1336 (explaining that "regardless of

whether the examiner agreed with" a patent owner's statements, those "statements still inform the proper construction of the term").

> **D.  Term 4: "selectively transmit[ting, by the plurality of gateway units,] the content requests to the service provider network in accordance with the controller instructions" ('468: Claims 1 and 23 / '925: Claims 1 and 29)**

| MCM's Construction | DISH's Construction |
|---|---|
| "a gateway unit, under control of the remotely located controller node, executes previously received controller instructions to determine whether to transmit a content request from a user or to take other action (e.g., deny the content request, redirect the content request, or notify authorities regarding the content request)" | "transmitting all content requests to take place within the service provider network in response to the controller instructions' decision to transmit the content requests" |

The parties' dispute centers on whether all content requests that are transmitted must travel within the service provider network. MCM's argument that the content requests can travel outside of the service provider network reflects its flawed interpretation of the "service provider network" term described above. DISH's construction accurately reflects the specification, MCM's admissions in IPR, and admissions MCM's expert confirmed during deposition, all of which demonstrate that the transmitted content requests *all* must take place within the "service provider network."

The specification unequivocally states "*all* ICP-CG *communications* take place *within* the ISP side of the network." '468 Patent at 4:33-34 (emphases added). As explained in DISH's opening brief, because "all" communications take place *within* the service provider network, the specification requires that "content requests" also travel *within* the service provider network. *See The Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1305 (Fed. Cir. 2017) (explaining that claim construction requires a process described in the specification when the specification states that the "process includes all of the embodiments as described").

The context of the claims is especially instructive for claim construction for determining

9

the ordinary and customary meaning. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms"). Read in context, the claimed system concerns regulating access to a "service provider network." Given the claimed "regulate access to a service provider network," the ordinary meaning of the "selectively transmit" step requires that the transmission occurs over that service provider network and not outside of the network. MCM's expert also agrees with this ordinary understanding.

> Q: Now, it's your understanding the way that it says 'selectively transmit the content request to the service provider network in accordance with the controller instructions,' to meet that claim limitation, *all* of the content requests need to be through the service provider network; correct?
>
> A: *That would be my understanding of it*.

Ex. M at 56:12-20 (objections omitted) (emphasis added).

Despite MCM's expert agreeing that the content requests are all sent through (i.e., within) the service provider network, MCM suggests that DISH's proposed construction "is inconsistent with the specification." MCM premises its argument by suggesting that DISH's construction "explicitly encompasses subscriber devices that are networked together on a LAN." Dkt. No. 53 at 12. In support, MCM relies on its own annotations to Figure 1 and a citation to the specification. However, the actual Figure 1 does not show a LAN at all:



'468 Patent at Fig. 1.

10

As for the specification, the quote that MCM cites but fails to include in its responsive brief demonstrates the flaw in MCM's argument:

> The ICPs control the processing of data sent between subscribers (e.g., client PCs or LAN servers) and the ISPs or content servers with which they are exchanging information, using the CGs.

'468 Patent at 3:55-58. At most, this portion of the specification suggests that subscribers may use "PCs" or "LAN servers." *Id.* MCM provides no explanation for why Figure 1 must include a LAN or why the LAN would be between the communication gateways and the alleged service provider network when in fact it fails to show one. The LAN may just as likely be located between the subscriber terminal and the communication gateway. Thus, the presence or lack thereof of a LAN is of no import to DISH's proposed construction and did not deter MCM's expert from his admissions.

Finally, MCM's response brief suggests that when a subscriber owns, as opposed to leases, a set-top box, that the box would no longer be a part of the "service provider network" under DISH's construction. Dkt. No. 53 at 12-13. That is not the case. Although a subscriber may own the set-top box, that box still operates using the controller instructions and other operating parameters sent to the box by the service provider. To the extent that the service provider maintains this level of control, the set-top box would still be "operated or controlled" by the service provider.

E. Term 5: "gateway units" ('468 Patent: Claims 1 and 23)

| MCM's Amended Construction | DISH's Construction |
|---|---|
| "a computer device that is ~~located within a subscriber premise,~~ remote from the controller node, that is under control of the controller node, and that is usable by a subscriber to perform certain functionality only as permitted by the controller node" | "computer devices that are remote from the controller node and interface with the service provider network and a subscriber terminal" |

While MCM correctly concedes that "gateway units" need not be "located within a subscriber premise," MCM's amended construction includes other unnecessary limitations. As

11

shown in DISH's briefs, the Court should reject these extraneous limitations and adopt DISH's construction.  *See* Dkt. No. 48 at 19-22; Dkt. No. 52 at 18-19.

F. **Term 6: "network elements" ('925: Claims 1 and 29)**

| MCM's Construction | DISH's Construction |
|---|---|
| "a computer device that is located remote from the controller node, that is under control of the controller node, and that is usable by a subscriber to perform certain functionality only as permitted by the controller node" | "computer devices within the service provider network" |

The parties' dispute centers on whether the differently claimed "network elements" of the '925 Patent and "gateway units" of the '925 and '468 Patent should be construed differently or the same.  MCM removed from its original proposed construction the distinction that the gateway units must be "located within a subscriber premise."  Claim construction principles suggest different terms of claims should be interpreted differently without some suggestion to the contrary.  *See CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings.").  MCM offers no such reason.

MCM now suggests that even if the terms are "interpreted to mean the same thing, that does not mean they are the same device."  Dkt. No. 53 at 14 (emphasis omitted).  However, carrying MCM's logic forward to the dependent claims demonstrates the flaws in MCM's logic.  As originally drafted, claim 24 includes both "communication gateways" and "network elements."

> 24. The system of claim 1 wherein the controller instructions include controller instructions to be distributed to a plurality of ***communication gateways*** via the plurality of ***network elements***.

'925 Patent at Claim 24 (emphasis added).  As both parties agree, "communication gateways" are the same as "gateway units."  *See, e.g.*, Dkt. No. 48 at 19-22; Dkt. No. 51 at 20-23; '925 Patent at 3:50-52.  Substituting MCM's constructions into claim 24 reads as follows:

12

24.     The system of claim 1 wherein the controller instructions include controller instructions to be distributed to a plurality of ***computer device[s] that [are] located remote from the controller node, that [are] under control of the controller node, and that [are] usable by a subscriber to perform certain functionality only as permitted by the controller node*** via the plurality of ***computer device[s] that [are] located remote from the controller node, that [are] under control of the controller node, and that [are] usable by a subscriber to perform certain functionality only as permitted by the controller node***.

Thus, adopting MCM's proposed constructions leads to absurd results with regards to claim 24. Instead of having the same meaning, as MCM suggests, the Applicant chose different terms that must be given different meanings. *See CAE Screenplates*, 224 F.3d at 1317.

The specification supports DISH's broader construction because it explains "[n]etwork elements 54, 55 may include, for example, network switches and routers. SPA-controlled network elements 54 aid in regulating access and distributing content through network 52." '925 Patent at 5:11-14. Similarly, the specification states "SPA-controlled network elements 54 may include one or more network interfaces 300, one or more processors 302, a memory device 304 including a database, and one or more switch modules 306 for providing routing and switching services." *Id.* at 7:27-31. Thus, the specification demonstrates that network elements are computer devices that are used within the service provider network.

## II.    CONSTRUCTION OF DEPENDENT CLAIM TERMS

Under *Phillips*, deviation from the plain-and-ordinary-meaning rule must be supported by evidence in the intrinsic record that the applicant gave a term a special meaning or acted as his own lexicographer. *Phillips v. AWH Corp*, 415 F.3d 1303, 1326 (Fed. Cir. 2005). MCM cites no such evidence warranting construction. Indeed, when doing his validity analysis for the IPR, MCM's expert saw no need to interpret any of the dependent claims and used the plain and ordinary meaning of those terms. *See, e.g.*, Ex. M at 81:8-9 ("I am applying the plain and ordinary meaning of unique"); 78:8-87:12 (discussing Mr. Williams's application of plain and ordinary

13

meaning in the IPR for the dependent claim terms below).

### A. Term 7: "if the gateway unit enters the inactive state" ('468: Claim 29)

DISH does not dispute that "[e]verything [DISH] describes from the specification of the '468 Patent could happen within a reasonable time after the gateway unit enters an inactive state without compromising any of the security measures also described therein." Dkt. No. 53 at 15. However, MCM provides no reason why this Court should adopt a construction that departs from the plain and ordinary meaning of the term. In fact, MCM concedes that "[t]he *'468 Patent is agnostic on the temporal relationship* between when the gateway unit enters the inactive state and when the gateway unit notifies the controller node that the gateway unit has entered the inactive state." Dkt. No. 51 at 26 (emphasis added). Thus, MCM itself acknowledges that the specification does not support importing limitations into this term.

### B. Term 8: "registration information" ('468: Claim 33)

MCM asserts that "MCM fails to understand how the plain language of the '468 Patent specification contradicts the 'plain and ordinary meaning' of the claim language." Dkt. No. 53 at 16. However, MCM's argument assumes, without any support, that its proposed construction is consistent with the plain and ordinary meaning of the term. It is not. None of the citations provided by MCM or DISH supports limiting "registration information" as MCM suggests.

### C. Term 9: "uniquely" ('468: Claim 24)

DISH's position has always been that a jury would readily understand "uniquely" without further construction. DISH only provided citations to the portion of the specification that used "uniquely" to show that MCM provided no reason to depart from the plain and ordinary meaning of the term. MCM still has not done so. Additionally, MCM's suggestion that its construction "simply clarifies the context in which a device may be deemed 'unique'" is unnecessary and redundant. Independent claim 23 (upon which claim 24 depends) already states that the claimed

method is for regulating access to a service provider network. There is no further need to clarify the network the devices are unique to.

### D. Term 10: "initial operating parameters" ('468: Claim 33)

MCM argues that "'initial' is a temporal restriction, and MCM's proposed construction clarifies that temporal restriction." Dkt. No. 53 at 17 (citing '468 Patent at 7:23-33). However, MCM does not explain why "initial" needs clarification in the first place. As DISH explains in its responsive brief, "CGs *may be* required to register with ICP 50 when they are powered up for the first time." '468 Patent at 7:20-21 (emphasis added). Thus, MCM's construction requires a limitation ("after registration") that only *might* occur.

### E. Term 11: "subscriber management system" ('925: Claim 25)[1]
### F. Term 12: "authenticate subscribers or devices before allowing access into the service provider network" ('925: Claim 25)

## III. DISH'S EXPERT DECLARATION

MCM sought to strike the declaration of Tony Wechselberger by suggesting that it relates to a validity analysis rather than claim construction issues. Dkt. No. 53 at 18-19. This Court properly denied MCM's request at a telephonic hearing on April 10, 2019. Mr. Wechselberger's factual statements regarding the state of the art are proper because he reasonably relies on those statements to form his claim construction opinions. Indeed, the declaration that MCM submitted from Joel Williams relates exclusively (and dedicates over half of the declaration) to validity issues in response to the Unified Patents IPR. *See* Ex. M at 25:12-20. The Court rightly refused MCM's request and can appropriately consider DISH's declaration.

## IV. CONCLUSION

For these reasons, DISH respectfully requests the Court to adopt DISH's constructions.

---

[1] On April 15, 2019, counsel for MCM informed DISH that MCM agrees that terms 11 and 12 should have their plan and ordinary meaning.

Dated: April 15, 2019

Respectfully submitted,

*Ali Dhanani*
G. Hopkins Guy, III (*pro hac vice*)
BAKER BOTTS L.L.P.
1001 Page Mill Road,
Building One, Suite 200
Palo Alto, CA 94304
Tel.: (650) 739-7500
Fax: (650) 739-7699
hop.guy@bakerbotts.com

Ali Dhanani (*pro hac vice*)
Texas State Bar No. 24055400
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, TX 77002
Tel.: (713) 229-1108
Fax: (713) 229-2808
ali.dhanani@bakerbotts.com

Kurt Pankratz (*pro hac vice*)
Texas State Bar No. 24013291
BAKER BOTTS L.L.P.
2001 Ross Ave., Suite 900
Dallas, TX 75201
Tel.: (214) 953-6584
Fax: (214) 661-4584
kurt.pankratz@bakerbotts.com

John P. Palmer
State Bar No. 15430600
NAMAN, HOWELL, SMITH & LEE, PLLC
400 Austin Ave., Suite 800
P.O. Box 1470
Waco, Texas 76703
Tel: (254) 755-4100
Fax: (254) 754-6331
palmer@namanhowell.com

***Attorneys for Defendant DISH Network L.L.C.***

## **CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via electronic mail on April 15, 2019.

                                                             */s/ Ali Dhanani*